[Cite as *State v. Marcum*, 2018-Ohio-1009.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | CASE NO. CA2017-05-057 |
| | : | O P I N I O N |
| - vs - | | 3/19/2018 |
| | : | |
| MICHAEL A. MARCUM, | : | |
| Defendant-Appellant. | : | |

CRIMINAL APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
Case No. CR2016-06-0888

Michael T. Gmoser, Butler County Prosecuting Attorney, Michael Greer, Government Services Center, 315 High Street, 11th Floor, Hamilton, Ohio 45011, for plaintiff-appellee

Scott N. Blauvelt, 315 South Monument Avenue, Hamilton, Ohio 45011, for defendant-appellant

**HENDRICKSON, J.**

{¶ 1} Michael Marcum appeals his convictions in the Butler County Court of Common Pleas for robbery offenses. For the reasons detailed below, this court affirms Marcum's convictions.

{¶ 2} Shortly before 8 p.m. on February 17, 2016, a man entered Discount Tobacco on Breiel Boulevard in Middletown, displayed a knife, and demanded cash from the

employee. The individual concealed his face with a "doo rag," and was otherwise covered with clothing, including a dark jacket, white gloves, and white shoes. After the employee gave him $300, the man left on foot. A responding police officer's K-9 unit tracked a scent southwest from the tobacco store. The track ended, unsuccessfully, around the intersection of Grand Avenue and Gideon Road.

{¶ 3} Seven weeks later, at around 4:00 p.m. on April 6, 2016, a man entered the Breiel Boulevard Walgreens, which is located a block south of Discount Tobacco. The man handed the check-out employee a note demanding cash and indicating that he possessed a gun. The employee provided the man with $193, and the man fled on foot. A K-9 unit tracked a scent southwest through a residential area. The K-9 unit lost the scent in the area of 723 Eaton Avenue, less than a half mile from the Walgreens. Marcum's rented home, located at 3921 Lewis Street, is visible from where the K-9 track ended.

{¶ 4} Marcum's sister-in-law saw a Facebook post discussing the Walgreens robbery the same day it happened. She suspected Marcum was the suspect and contacted the Middletown police department. Middletown police detectives then spoke with Marcum at his home. Marcum denied any involvement in the Walgreens robbery and gave the detectives written consent to search the home. A search by the police failed to reveal any evidence related to the Walgreens robbery.

{¶ 5} Detectives interviewed Marcum's wife, Marie. They understood Marie had left the home a few days prior because of a fight with Marcum. Marie reviewed security camera footage of the Discount Tobacco robbery and identified the coat the suspect was wearing in the video as her green jacket. She told police that they would find the jacket in the home. In addition, Marie provided the detectives with written consent to search the home. At the time, Marie did not have a key to the home but showed the police how they could enter the home through a window. In the subsequent search of the home, the police recovered white gloves,

a pair of throwing knives, a green winter jacket, and a pair of white "Skechers" brand shoes.

{¶ 6} In March 2017, a Butler County grand jury indicted Marcum with one count of aggravated robbery, a violation of R.C. 2911.01(A)(1) and a first-degree felony (Discount Tobacco robbery), and one count of robbery, a violation of R.C. 2911.02(A)(2) and a second-degree felony (Walgreens robbery). Prior to trial, Marcum moved to suppress evidence collected by police in the search of his home consented to by his wife. Marcum argued that Marie did not have authority to consent to the search. The court held an evidentiary hearing and subsequently denied the motion. The court found that Marie possessed actual authority to consent to the search. The court further found that even if Marie did not have actual authority, the police reasonably relied on her apparent ability to consent to the search.

{¶ 7} The case proceeded to a jury trial. The jury initially heard evidence from the two store employees and watched security camera footage of the robberies. As to the Discount Tobacco robbery, the employee identified Marcum by her familiarity with his voice; he was a customer and had worked at the strip mall in which the store was located. The State then called Marcum's sister-in-law, stepdaughter, and a Middletown police detective, who all testified that they recognized Marcum in the Walgreens robbery security camera footage. Finally, the Middletown detective and his partner testified about their robbery investigations. After deliberation, the jury found Marcum guilty of both counts in the indictment. The court sentenced Marcum to an aggregate sentence of 12 years in prison.

{¶ 8} Marcum appeals, raising five assignments of error, which we will address out of order for ease of analysis.

{¶ 9} Assignment of Error No. 3:

{¶ 10} THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT IN OVERRULING HIS MOTION TO SUPPRESS EVIDENCE.

{¶ 11} Marcum argues that the court erred in denying his suppression motion

because Marie lacked authority to give police consent to search the home. Marcum contends that Marie moved out of the home with no intention of returning eight days before the search occurred, changed the mailing address for her retirement check, and did not take a key with her to gain re-entry to the home.

{¶ 12} Marcum also argues that it was unreasonable for the police to believe that Marie had apparent authority to consent to the search of the home. Marcum contends that the police were aware that Marie left the home and was residing with her daughter, she did not have a key to the home, and to gain entry to the home a police officer had to climb through a window and open the door from inside.

{¶ 13} Our review of a trial court's denial of a motion to suppress evidence presents a mixed question of law and fact. *State v. Cochran*, 12th Dist. Preble No. CA2006-10-023, 2007-Ohio-3353, ¶ 12. Acting as the trier of fact, the trial court is in the best position to resolve factual questions and evaluate witness credibility. *Id.* Therefore, when reviewing the denial of a motion to suppress, a reviewing court is bound to accept the trial court's findings of fact if they are supported by competent, credible evidence. *State v. Oatis*, 12th Dist. Butler No. CA2005-03-074, 2005-Ohio-6038, ¶ 10. "An appellate court, however, independently reviews the trial court's legal conclusions based on those facts and determines, without deference to the trial court's decision, whether as a matter of law, the facts satisfy the appropriate legal standard." *Cochran* at ¶ 12.

{¶ 14} The Fourth Amendment to the United States Constitution assures the "right of the people to be secure in their * * * houses * * * against unreasonable searches and seizures." "[S]earches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586, 100 S.Ct. 1371 (1980). However, because the ultimate touchstone of the Fourth Amendment is reasonableness, the warrant requirement is subject to certain exceptions. *Katz v. United States*, 389 U.S. 347, 357, 88

S.Ct. 507 (1967).

{¶ 15} One exception to the warrant requirement is a search conducted pursuant to consent. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041 (1973). "When the state seeks to establish consent for a warrantless search, it is not limited to proving that the defendant himself consented, but it may also show that the consent was obtained from a third party who possessed common authority or other sufficient relationship over the premises to be inspected." *State v. Boland*, 12th Dist. Clermont Nos. CA2007-01-016 and CA2007-01-017, 2008-Ohio-353, ¶ 12, citing *United States v. Matlock*, 415 U.S. 164, 171, 94 S.Ct. 988 (1974).

{¶ 16} "Common authority is, of course, not to be implied from the mere property interest a third party has in the property. The authority which justifies the third-party consent does not rest upon the law of property, with its attendant historical and legal refinements, * * * but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." *Matlock* at 171, fn. 7. The state bears the burden of establishing common authority. *Illinois v. Rodriguez*, 497 U.S. 177, 181, 110 S.Ct. 2793 (1990).

{¶ 17} Even if a third party does not possess actual authority to consent to a search, the Fourth Amendment is not violated if the police reasonably relied on the third party's apparent authority to consent. *State v. Norman*, 12th Dist. Warren No. CA2014-02-033, 2014-Ohio-5084, ¶ 38. Apparent authority is judged by an objective standard. *Id.* A warrantless search based on consent is permissible if "the facts available to the officer at the moment [would] 'warrant a man of reasonable caution in the belief that the consenting party had authority over the premises.'" *Id.*, citing *Rodriguez* at 188, in turn quoting *Terry v. Ohio*,

392 U.S. 1, 21-22, 88 S.Ct. 1868 (1968).

{¶ 18}  At the suppression hearing, Detective Jonathon Rawlins testified that he first entered Marcum's home with Marcum's consent on the day of the Walgreens robbery.  While he conducted his search, he noted that the home contained both male and female clothing.  Detective Rawlins had earlier met both Marcum and Marie.  Marie introduced herself to him as Marcum's wife.  During Marcum's police interview, Marcum said that he and Marie had been in an argument and she left the home a "couple days" prior.

{¶ 19}  Detective Rawlins interviewed Marie on April 7, 2016.  She identified a jacket that Marcum was allegedly wearing in the Discount Tobacco security video.  Marie told Detective Rawlins that the jacket was in the home.  Marie said that she left the home on April 3, 2016, and went to stay with her daughter for a few days over an argument concerning money that Marcum stole from Marie to support his drug habit.

{¶ 20}  Detective Rawlins went on to testify that his impression from speaking with Marie was that she had not "completely left" the home.  Marie told him that she left most of her possessions in the home and she only took one outfit with her.  Detective Rawlins believed this statement was corroborated by the amount of women's clothing he observed at the home during the first search.

{¶ 21}  Detective Rawlins also testified that he contacted the Marcums' landlords and confirmed that the home was rented to both Marcum and Marie.  The state introduced a copy of the lease agreement as well as a utility bill for 3921 Lewis Street addressed to both Marcum and Marie.[1]

{¶ 22}  Detective Rawlins sought and obtained Marie's written consent to search the

---

1. While Detective Rawlins identified these documents at trial, it is not clear from the record whether he obtained them before or after obtaining Marie's consent.  For purposes of this opinion we presume Detective Rawlins did not have access to these documents when he obtained Marie's consent.

the home. On the consent form she signed, Marie wrote her address as 3921 Lewis Street. Detective Rawlins, Marie, and other law enforcement people then went to the home together.

{¶ 23} Marie and the police officers proceeded to the back entrance of the home as the front door was barricaded from the inside.[2] The back door was either locked or would not open from the outside. Marie did not have a key but directed police to enter the home by climbing through a window adjacent to the back door and opening the door from the inside. The police subsequently searched the residence, locating Marie's green jacket among other items.

{¶ 24} Marie testified in support of Marcum at the motion to suppress hearing. As opposed to the April 3, 2016 date she allegedly provided Detective Rawlins, Marie stated that she moved out of the home on March 31, or eight days before the search. She left because Marcum stole money from her and threatened to physically harm her. When she left, she knew she was "never going back." However, Marie was uncertain whether she told Detective Rawlins that she permanently moved out of the home.

{¶ 25} When Marie moved out, she took three "big bags" of clothing with her comprised of clothes she regularly wore. She left the clothes she did not wear at the home. Marie knew when she left the home that if she did return she would have to bring the police with her. Marie testified that she did not take a house key with her when she left because she could not find one. She thought Marcum probably had the key when she left.

{¶ 26} Marie went back to the house on April 1 and sat in her car waiting to intercept her retirement check from the mailbox. She later changed the address where her retirement check would be sent. Marie admitted that she intended to attempt reunification with Marcum once he was released from jail.

---

2. Detective Rawlins observed the barricade when he was in the home the day before.

{¶ 27} There is some evidence to support the contention that Marie had authority to consent to the search. The premises were her marital home, they were leased to her, and her name appeared on a utility bill. She had only recently left the home because of a domestic argument. She left the home without some possessions. And she knew how to gain access to the home without a key. Nonetheless, the evidence at the suppression hearing was not "overly convincing" to establish that Marie had "joint access or control for most purposes."

{¶ 28} However, the record contains competent, credible evidence that Detective Rawlins reasonably relied on Marie's apparent authority to consent. The fact that she signed a written consent to search form indicates Marie's subjective belief that she possessed authority to allow the search. More significantly, Marie listed 3921 Lewis Street as her residence, which would convey to Detective Rawlins that Marie believed that location to be her current home. Moreover, Detective Rawlins had earlier met Marie and knew her to be Marcum's wife and knew that 3921 Lewis Street was the couple's home.

{¶ 29} Detective Rawlins understood that Marie had moved out of the residence only a few days before the search occurred and that she was temporarily staying with her daughter. Marie further told Detective Rawlins that she only took one outfit when she left, which Detective Rawlins believed was corroborated by his search of the home a day prior. Notably, Detective Rawlins did not merely rely upon his familiarity with Marie or her statements, he also contacted the owners of 3921 Lewis Street and confirmed that they were renting to both Marcum and Marie.

{¶ 30} Despite her lack of a key to enter the premises, Marie knew how to enter the home, which would also convey familiarity. Finally, Marie admitted she was not certain whether she told Detective Rawlins she had permanently moved out of the home. Based on this evidence, Detective Rawlins could objectively and reasonably surmise that Marie had

apparent authority to consent to a search of the home.

{¶ 31} There was some conflict in the testimony between Marie and Detective Rawlins, notably with respect to when Marie claimed to have told Detective Rawlins she moved out and with respect to the possessions she took with her. However, when there is a conflict in the testimony of witnesses, it is for the trier of fact to determine the weight and credibility to be given such evidence. *See State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. Credibility determinations are based not only on the substance of the testimony, but from all facts and circumstances surrounding the testimony, particularly the manner and demeanor of the witnesses, which only the trier of fact can observe. *State v. Preston*, 12th Dist. Clermont No. CA2012-05-036, 2012-Ohio-6176, ¶ 24. In this regard, the trial court stated that it found Marie's assertion that Detective Rawlins lied incredible.

{¶ 32} Marcum cites several cases for the proposition that law enforcement could not reasonably rely on the apparent authority of an individual who did not possess a key or otherwise was unable to enter a locked area. *State v. Denune*, 82 Ohio App.3d 497 (12th Dist.1992); *State v. Norman*, 12th Dist. Warren No. CA2014-02-033, 2014-Ohio-5084; and *State v. Gordnoshnka*, 8th Dist. Cuyahoga No. 86319, 2006-Ohio-563. In *Denune*, this court found that police could not reasonably conclude that salvage yard employees could validly authorize the search of padlocked trailers that a company stored at the yard, where the employees did not have keys to the padlocks. *Id*. at 510. In *Norman*, this court held that law enforcement could not reasonably rely on the apparent authority of a homeowner's consent to search a rented basement, where the homeowner produced a written lease and could not open the locked door to the basement. *Id*. at ¶ 39. In *Gordnoshnka*, the court held that police could not reasonably rely on the apparent authority of a homeowner who gave consent to search his adult son's locked rooms, to which he had no key and where he told the police

that the rooms were solely the son's. *Id.* at ¶ 19. The only common thread between those cases and this case is that the police were aware that Marie lacked a key to enter the home. However, as discussed, there was other evidence upon which Detective Rawlins could reasonably rely to conclude that Marie, despite not having a key, had joint access or control of the home for most purposes. Accordingly, this court overrules Marcum's third assignment of error.

{¶ 33} Assignment of Error No. 4:

{¶ 34} APPELLANT WAS DENIED THE RIGHT TO DUE PROCESS AND A FAIR TRIAL BY THE ADMISSION OF IRRELEVANT PRIOR BAD ACTS EVIDENCE.

{¶ 35} In his fourth assignment of error, Marcum argues that that the court erred in allowing several state's witnesses to testify to prior bad acts in contravention of Evid.R. 404(B). Specifically, Marcum points to testimony from his stepdaughter, Kenetta Lawson, and his sister-in-law, Millie Manns, alleging that he stole cash from his wife and testimony from Detective Rawlins that the detective was familiar with Marcum because of another investigation.

{¶ 36} Marcum concedes that he is limited to a review for plain error because he did not object to the challenged testimony. Therefore, on appeal, he has waived any error in this regard except plain error. "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Crim.R. 52(B). The accused bears the burden to demonstrate plain error. *State v. Quarterman*, 140 Ohio St.3d 464, 2014-Ohio-4034 at ¶ 16. The defendant must show "an error, i.e., a deviation from a legal rule" that constitutes "an 'obvious' defect in the trial proceedings." *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002), quoting *State v. Sanders*, 92 Ohio St.3d 245, 257 (2001).

{¶ 37} Plain error does not exist unless, but for the error, the outcome of the trial would have been different. *State v. Blacker*, 12th Dist. Warren No. CA2008-07-094, 2009-

Ohio-5519, ¶ 39. Marcum argues that the outcome of trial would have been different but for the challenged testimony because there was not overwhelming evidence of his guilt.

{¶ 38} "Evidence that an accused committed a crime other than the one for which he is on trial is not admissible when its sole purpose is to show the accused's propensity or inclination to commit crime or that he acted in conformity with bad character." *State v. Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, ¶ 15. To determine the admissibility of other acts evidence, the court should first "consider whether the other acts evidence is relevant to making any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." *Id.* at ¶ 20, citing Evid.R. 401. Second, the court should determine if "evidence of the other crimes, wrongs, or acts is presented to prove the character of the accused in order to show activity in conformity therewith or whether the other acts evidence is presented for a legitimate purpose, such as those stated in Evid.R. 404(B)." *Id.* Third, the court should "consider whether the probative value of the other acts evidence is substantially outweighed by the danger of unfair prejudice." *Id.*, citing Evid.R. 403.

{¶ 39} This court concludes that the challenged testimony was improper. The testimony was irrelevant to the determination of the relevant issues, i.e., whether Marcum committed the robberies at Discount Tobacco and Walgreens. Otherwise, the evidence was only useful to show Marcum's propensity for committing theft crimes or being a criminal. As such, there was a danger of unfair prejudice resulting from the admission of the improper evidence.

{¶ 40} Nonetheless, this court does not find that the error rose to the level of plain error. The testimony was brief in the context of the three-day trial. Neither party focused on the testimony, which was primarily contextual, i.e., the witnesses were discussing foundational or background information. Finally, there was "substantial other evidence" in the

- 11 -

record to support Marcum's conviction. See *State v. Neyland*, 139 Ohio St.3d 353, 2014-Ohio-1914, at ¶ 158 (applying harmless error analysis to the improper admission of other acts evidence). As will be discussed in response to Marcum's first and second assignments of error, below, security camera footage, witness identification, circumstantial evidence, and physical evidence recovered from Marcum's home linked Marcum to the Discount Tobacco aggravated robbery and the Walgreens robbery. After thoroughly reviewing the record, this court is not concerned that the challenged testimony affected the outcome of the case. Accordingly, this court overrules Marcum's fourth assignment of error.

{¶ 41} Assignment of Error No. 5:

{¶ 42} INEFFECTIVE ASSISTANCE OF COUNSEL.

{¶ 43} Marcum argues that his trial counsel provided ineffective assistance of counsel by failing to object to the prior bad acts evidence discussed in his fourth assignment of error. To prevail on an ineffective assistance of counsel claim, Marcum must show his trial counsel's performance was deficient and that he was prejudiced as a result. *State v. Clarke*, 12th Dist. Butler No. CA2015-11-189, 2016-Ohio-7187, ¶ 49; *Strickland v. Washington*, 466 U.S. 668, 687-688, 104 S. Ct. 2052 (1984). Trial counsel's performance will not be deemed deficient unless it fell below an objective standard of reasonableness. *Strickland* at 688. To show prejudice, Marcum must establish that, but for his trial counsel's errors, there is a reasonable probability that the result of his trial would have been different. *Id.* at 694.

{¶ 44} The failure to satisfy either prong of the *Strickland* test is fatal to an ineffective assistance of counsel claim. *Clarke* at ¶ 49. Counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *State v. Burns*, 12th Dist. Clinton No. CA2013-10-019, 2014-Ohio-4625, ¶ 7.

{¶ 45} Our review of the record indicates that there was a degree of spontaneity to

the challenged testimony that could have prevented defense counsel from anticipating the objectionable testimony before it reached the ears of the jury. The failure to object therefore could be strategic, as objecting to the testimony after the jury had already heard it could narrow its focus on the improper evidence.

{¶ 46} However, even if trial counsel's performance was deficient, Marcum has failed to meet his burden to demonstrate prejudice, i.e., a different outcome at trial. Again, as will be discussed in response to the next two assignments of error, substantial other evidence supported the jury's verdicts. Consequently, this court overrules Marcum's fifth assignment of error.

{¶ 47} Assignment of Error No.1:

{¶ 48} THE VERDICT FOR COUNT ONE WAS CONTRARY TO THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 49} Assignment of Error No. 2:

{¶ 50} THE VERDICT FOR COUNT TWO WAS CONTRARY TO THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 51} In his first and second assignments of error, Marcum argues that his convictions were not supported by the weight of the evidence because the state failed to prove his identity as the Discount Tobacco and Walgreens robber. A manifest weight of the evidence challenge examines the "inclination of the greater amount of credible evidence, offered at a trial, to support one side of the issue rather than the other." *State v. Barnett*, 12th Dist. Butler No. CA2011-09-177, 2012-Ohio-2372, ¶ 14. To determine whether a conviction is against the manifest weight of the evidence, the reviewing court must look at the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving the conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction

must be reversed and a new trial ordered. *Id.* An appellate court will overturn a conviction due to the manifest weight of the evidence only in extraordinary circumstances when the evidence presented at trial weighs heavily in favor of acquittal. *Id.* at ¶ 15.

Count One – Discount Tobacco robbery

**{¶ 52}** The state introduced security camera footage and still photographs of the robbery. The images depict a man entering the tobacco store wearing jeans, a dark-colored jacket, a knit hat, a face covering of some sort, white gloves, and white shoes. The man appears to be carrying a knife in his right hand.

**{¶ 53}** The tobacco store employee, Melinda Martin, testified that the suspect was approximately six feet tall and of medium build. She believed that the man was in his late 40s or early 50s because she saw grey beard hairs through the "doo rag." Marcum would have been 43 years old at the time of the robbery.

**{¶ 54}** Martin recognized Marcum's "deep" voice.[3] Martin was familiar with Marcum because he was a customer. Marcum's stepdaughter, Kenetta Lawson confirmed that Marcum shopped at Discount Tobacco. Martin also testified that Marcum had worked on the strip mall where the store was located. Martin recalled an incident when Marcum was working at the building and asked her if she always worked alone. Detective Rawlins testified that he spoke with the owner of the strip mall and confirmed that Marcum did some work on the property.

**{¶ 55}** Martin testified that the knife, white gloves, and the jacket recovered by police from Marcum's home either were the items she observed on the suspect or resembled them. Detective Rawlins testified concerning some of the similarities between what police recovered at Marcum's home and the items of clothing worn by the suspect in the security camera

---

3. It appears that Martin only recognized Marcum's voice after he was identified as a suspect in the Walgreens robbery.

footage. With respect to the jacket, Detective Rawlins noted the location of snaps, tags, and zippers on the recovered jacket appeared the same as the jacket worn by the suspect in the still images of the robbery. Detective Rawlins also noted certain similarities between the pair of confiscated Skechers shoes and the white shoes worn by the suspect in the security footage. Detective Rawlins additionally testified that Marcum stood approximately 6' 2" to 6' 3" tall, which was consistent with the height of the suspect depicted in the security camera footage. Finally, the K-9 unit tracked a scent generally in the direction of Marcum's residence, which was located approximately three quarters of a mile from the tobacco store.

{¶ 56} This court concludes that Martin's identification of Marcum and the various circumstantial evidence described above would allow rational jurors to reasonably conclude that the state proved Marcum's identity beyond a reasonable doubt. As such, this court overrules Marcum's first assignment of error.

### Count Two – Walgreens robbery

{¶ 57} The state introduced security camera footage of the Walgreens robbery, which was of poor quality. However, it depicts a taller man wearing a knit hat and glasses entering the Walgreens. The man later approaches the check-out area and passes a note to the check-out employee. The employee looks at the note, opens the register, puts money into a plastic bag and hands the bag to the suspect. The check-out employee could not identify Marcum. However, the employee testified that Walgreens trained her not to make eye contact with a robber. A K-9 unit tracked a human scent from Walgreens southwest to the area of 723 Eaton Avenue. Detective Rawlins testified that Marcum's home was 150 yards from 723 Eaton Avenue and the front door was visible from that location.

{¶ 58} Kenetta Lawson, Marcum's stepdaughter, testified that her mother had been married to Marcum for 11 years and that she had known Marcum for 13 years. They had a "good" and "trusting" relationship. Lawson testified that she recognized Marcum from the

Walgreens security camera footage by his appearance, gait, and mannerisms. When asked if she had any doubt as to whether Marcum was depicted in the security video, Lawson testified "I want to tell you yes, that there's a doubt, but, watching it, I don't think there is." Lawson further testified that she recognized the jacket the man was wearing.

{¶ 59} Millie Manns, Marie's sister, testified that she had known Marcum from 13 years. Manns testified that she saw a Facebook post about the robbery and then texted Lawson with her suspicions. After discussing the matter with Lawson, Manns contacted Middletown police. Manns testified that she also recognized Marcum by his appearance and gait in the security video. Manns had "no doubt" that Marcum was the individual depicted in the video.

{¶ 60} Detective Steve Winters testified that he first met Marcum in October or November of 2015 and that he had encountered him eight to ten times prior to his investigation. Detective Winters explained that when he reviewed the Walgreens security video he recognized the person in it but could not recall Marcum's name. Detective Rawlins agreed that when he and Detective Winters were watching the video, Detective Winters repeatedly stated "I know who he is, I just dealt with him." Detective Rawlins later told Detective Winters about the tip called in by Manns identifying Marcum as a potential suspect. Detective Winters then confirmed that Marcum was who he was thinking of when he initially saw the video.

{¶ 61} When Detectives Rawlins and Winters interviewed Marcum he was clean shaven. However, Marcum told the officers that he had been in Walgreens the morning of the robbery and that at that time he had a moustache, which he had dyed black with shoe polish. He was only in Walgreens momentarily. He walked down one aisle and then left the store. The police believed this was Marcum's first attempt to rob the Walgreens but he abandoned the effort because there were too many people inside the store.

{¶ 62} Marcum told the detectives that other than visiting Walgreens he left his home once to visit a cell phone store at around 5:20 p.m., or approximately one and one-half hours after the Walgreens robbery. Marcum told police he had $40 and spent it all on a cell phone. The detectives corroborated that Marcum went to the cell phone store and that he spent $40 on a cell phone. However, security camera footage at the store appears to depict Marcum with more than $40.

{¶ 63} Based on this evidence, rational jurors could reasonably conclude that the state proved Marcum's identity as the perpetrator of the Walgreens robbery beyond a reasonable doubt. This court overrules Marcum's second assignment of error.

{¶ 64} Having addressed all of Marcum's assignments of error, we hereby affirm his conviction on both charges.

S. POWELL, P.J., and RINGLAND, J., concur.