[Cite as *State v. Reeder*, 2021-Ohio-2988.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

CLINTON COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Appellee, | : | CASE NOS. CA2020-09-012 |
| | | CA2020-09-013 |
| - vs - | : | |
| | : | O P I N I O N |
| | : | 8/30/2021 |
| JASON DANIEL REEDER, | : | |
| Appellant. | : | |

CRIMINAL APPEAL FROM CLINTON COUNTY COURT OF COMMON PLEAS
Case Nos. CRI 19-500-231 and CRI 20-500-028

Andrew T. McCoy, Clinton County Prosecuting Attorney, and Danielle E. Sollars, Assistant Prosecuting Attorney, for appellee.

Jon R. Sinclair, for appellant.

**HENDRICKSON, J.**

{¶1} Appellant, Jason Daniel Reeder, appeals from his convictions in the Clinton County Court of Common Pleas for robbery, telecommunications fraud, and various drug-possession offenses. For the reasons set forth below, we affirm appellant's convictions.

{¶2} At approximately 8:53 p.m. on December 2, 2019, a man entered Hidden Carry-Out, a convenience store in Wilmington, Clinton County, Ohio, wearing dark pants, a

brown Carhartt-style jacket, a black ski mask or toboggan type mask, and black gloves. The man approached the store's worker, Carl Butts, and whispered, "I want your money." Butts thought the individual was joking and laughed. The man in the mask responded by pulling an object out of his pocket and striking Butts multiple times on the head. Butts, who began bleeding from injuries to his head, fell to the floor.

{¶3} The man demanded entry into the cash register and threatened to strike Butts again if Butts did not tell him how to open it. Butts told the man how to open the register and the man took approximately $450 in cash. The man also took a number of scratch-off lottery tickets before fleeing the store. Butts then pressed the store's emergency alarm to notify law enforcement of the robbery. Other than Butts, no one was present in the store during the robbery.

{¶4} Multiple officers from the Wilmington Police Department responded to the scene. When they arrived, they found Butts bleeding heavily from his head. They also found the handle of an airsoft gun. The item was taken into evidence, as the officers believed the item was used during the robbery to cause injuries to Butts' head.

{¶5} Butts was able to provide the officers with a description of the robbery-suspect. Butts told officers that while he "recognized the voice" of his assailant as someone who had been in the store before, he was unable to identify the robber as the person had obscured his face with a mask. Butts provided a description of what his assailant had been wearing and described the man as a "light-skinned African American man." Butts was then transported to a nearby hospital, where he received nine staples and five stitches to his head.

{¶6} The owner of Hidden Carry-Out, Depak Patel, and his son, Nayan Patel, who managed the convenience store and handled the lottery portion of the business, arrived at

Hidden Carry-Out after the robbery. The Patels provided law enforcement with a recording of the robbery, which had been caught on the store's security cameras. Nayan then contacted the Ohio Lottery Commission about the stolen lottery tickets.

{¶7} Regarding the lottery tickets, Nayan explained that each week the store received a delivery of lottery tickets with an invoice that inventoried each individual ticket that had been sent. Nayan went through each ticket and checked the ticket numbers against the invoice to make sure there had not been a mispack and that he received the correct items. He then scanned the invoice number to confirm receipt of the tickets. When it was time for the tickets to be placed on the store's floor for sale to customers, Nayan activated the roll of tickets. If a customer bought a lottery ticket, it could then be scanned though the lottery's own point of sale system.

{¶8} Michael Grause, an investigator with the Ohio Lottery Commission, looked into the lottery tickets stolen from Hidden Carry-Out. Grause explained that lottery tickets can be tracked similar to how UPS packages can be tracked. Each ticket in a roll has its own identifying number, comprised of three parts - a game number, a series or book number, and a ticket number. From this number, the Ohio Lottery is able to determine what store the ticket came from and in what store the ticket was eventually redeemed. When tickets are cashed in, they are validated over a telecommunication service known as the lottery system.

{¶9} From security footage of the robbery, it was determined that Cashword lottery tickets, as well as other lottery tickets, including a $250,000 A Year for Life ticket, had been taken. Grause was provided with the book numbers and the approximate span of tickets that were taken during the robbery. Using this information, Grause was able to run reports that identified when and where the stolen tickets were scanned to see if they were winning

tickets or where the tickets were validated, or turned in, for cash at a retail store. These reports showed that the stolen tickets were either checked or cashed in at four different locations in Wilmington. At 9:22 p.m. on December 2, 2019, nearly one-half hour after the robbery occurred, a $250,000 A Year for Life ticket was validated at the Sunoco on South Street. Between 10:32 p.m. and 10:34 p.m. on December 2, 2019, four Cashword lottery tickets were scanned to see if they were winning tickets at a Kroger. At 10:52 p.m. on December 2, 2019, one of the winning tickets that had been inquired about at Kroger was validated at a Sunoco on East Main Street. Finally, at 2:04 p.m. on December 3, 2019, a Cashword lottery ticket was validated at Shop N Go.

{¶10} The details of when and where the stolen lottery tickets had been validated were shared with the detectives investigating the robbery. The detectives used the information to obtain security footage of the stolen lottery tickets being validated at the Kroger and two Sunoco stores. The Shop N Go did not have surveillance footage of the validation, but did have the lottery ticket that had been cashed in. The security recordings and recovered lottery ticket were taken into evidence.

{¶11} Detectives Scott Baker and Cody Juillerat reviewed the security footage obtained from Hidden Carry-Out, Kroger, and the two Sunoco stores. The detectives observed that the individual who robbed Hidden Carry-Out wore a black toboggan that had a white tag on it. The black gloves the robber wore had white writing on the side. Additionally, the brown Carhartt-style jacket the robber wore had a pocket or a slit for a pocket on the chest area of the jacket. The individual who cashed in the stolen lottery tickets shortly after the robbery occurred was not dressed in the same clothing as the robber. The person who cashed in the lottery tickets wore jeans and a grey-blue jacket. The individual's face was visible on the security footage. Based on his prior dealings with

appellant, Detective Baker was able to identify appellant as the individual cashing the lottery tickets.

{¶12} Law enforcement obtained a warrant to search appellant's apartment for evidence relating to the robbery. Appellant resided on Mulberry Street in Wilmington. His apartment was located between Hidden Carry-Out and the South Street Sunoco, where the first stolen lottery ticket was validated. According to Detective Juillerat, it would only take two or three minutes to get from Hidden Carry-Out to appellant's residence by car and the two locations were easily within running distance of one another.

{¶13} When the warrant was executed on December 5, 2019, officers found appellant in the back bedroom of the apartment. Drugs and drug paraphernalia were also found in the back bedroom, leading law enforcement to obtain a second warrant for illegal narcotics. During the search, multiple items relating to the robbery were found. Black gloves with white writing on them were found next to the bed where appellant slept. In the living room, which contained two beds, a brown Carhartt-style jacket was located rolled up inside a pillowcase on one of the beds. The jacket had a pocket on the left side of the chest. A Cashword lottery ticket was found on the nightside table by appellant's bed. Additional Cashword lottery tickets were found in the kitchen trashcan. A black toboggan with a white tag was also located in the trashcan. A grey-blue jacket that looked like the jacket worn when appellant cashed in the lottery tickets was found hanging in a closet. Airsoft guns were also found in appellant's residence, although none appeared to be broken or missing a handle.

{¶14} Officers also discovered a white baggie of narcotics, a plate with drug residue, a glass pipe, and a digital scale with residue in a trashcan inside appellant's back bedroom. Two baggies of narcotics were found in a pair of shoes located on a shoe rack in appellant's

back bedroom.

{¶15} Several items recovered during the search of appellant's residence were sent off for laboratory testing, including DNA testing. While no blood was found on the black gloves recovered from appellant's apartment, appellant's DNA was found inside the gloves. Samples taken from the cuff and neck of the brown Carhartt-style jacket were tested and were found to be consistent with appellant's DNA. Appellant's DNA was not found on the toboggan located in the kitchen trashcan. Neither appellant's DNA nor Butts' DNA was found on boots taken from appellant's bedroom.

{¶16} DNA testing was also done on the airsoft gun handle recovered from Hidden Carry-Out. Though appellant's DNA was not found on the handle, Butts' DNA was found, suggesting that Butts had been struck with the item. Chemical testing of the narcotics found during the search revealed there were 2.79 grams of methamphetamine and 0.20 grams of a heroin and fentanyl mix in the baggies recovered from appellant's bedroom.

{¶17} An examination of the Cashword lottery tickets recovered from appellant's residence indicated that they were not the tickets stolen from Hidden Carry-Out. While the tickets were the same type of ticket (i.e., the Cashword game) stolen from the convenience store, the specific identification numbers on the tickets found in appellant's residence were not a match for the stolen tickets' identification numbers.

{¶18} Detectives Baker and Juillerat interviewed appellant subsequent to the search of his residence. During the interview, appellant denied being on the lease of the Mulberry Street apartment and denied that any of the drugs or drug paraphernalia found in the apartment belonged to him. However, appellant later admitted that the apartment was his "crib." In addition to admitting that he stayed there, appellant indicated he permitted others to move in and out of the apartment.

{¶19} Appellant denied that he robbed Hidden Carry-Out on December 2, 2019. When asked by Detective Baker where he was that night, appellant stated that he was not certain of his whereabouts but was "usually home." Appellant acknowledged he had been to Hidden Carry-Out on previous occasions, but he did not think he went to the store on the day of the robbery. Appellant claimed he did not remember cashing any lottery tickets on December 2, 2019, but admitted that he purchases lottery tickets, "all the time" and that "pretty much all [he] do[es] is Cashword" tickets. He denied that he had anything to do with the robbery at Hidden Carry-Out and stated that the lottery tickets found in his apartment had been purchased from Walmart. Appellant claimed he usually purchased his tickets from Walmart, Gas of America, Speedway, and a tobacco store because he tries to stay in his "circle" when playing the lottery. Appellant did not mention purchasing tickets or validating tickets at Kroger, Sunoco, or Shop N Go. He did claim that he had gotten lucky and found winning tickets before – sometimes in trashcans – but he could not remember where or when that occurred. Appellant never mentioned that he found a stack of Cashword lottery tickets by the railroad tracks near Doan Street.

{¶20} Appellant denied ownership of the black gloves found in the back bedroom. While he admitted that the shoes found in the back bedroom were his, he denied that the drugs found inside the shoes were his. He also acknowledged that the brown coat found in the pillowcase in the living room was his, but claimed he did not know that it had been rolled up inside the pillowcase.

{¶21} Appellant was arrested on December 5, 2019 on a charge of robbery. The charge was filed in the Clinton County Municipal Court on December 6, 2019. The case was subsequently bound over to the Clinton County Court of Common Pleas. On January 13, 2020, in Case No. CRI 19-500-231, appellant was indicted on one count of robbery in

violation of R.C. 2911.02(A)(2) and (B), a felony of the second degree, and one count of telecommunications fraud in violation of R.C. 2913.05(A) and (C), a felony of the fifth degree. Less than a month later, on February 10, 2020, appellant was indicted in Case No. CRI 20-500-028 on one count of aggravated possession of drugs (methamphetamine) in violation of R.C. 2925.11(A) and (C)(1)(a), one count of possession of heroin in violation of R.C. 2925.11(A) and (C)(6)(a), and one count of possession of a fentanyl-related compound in violation of R.C. 2925.11(A), all felonies of the fifth degree.

{¶22} Appellant pled not guilty to all charges and the two cases were consolidated for trial. A two-day jury trial commenced on May 27, 2020. The state presented testimony from Butts, Depak and Nayan Patel, Grause, and from law enforcement officers involved in the robbery investigation and search of appellant's residence. Appellant's recorded police interview with Detectives Baker and Juillerat, evidence obtained during the search of appellant's residence, and security footage of the robbery and the validation of the stolen lottery tickets were admitted into evidence.

{¶23} Appellant testified in his own defense. Appellant stated that on the evening of December 2, 2019, he was walking around Wilmington playing lottery tickets at various stores. Appellant denied that he went to Hidden Carry-Out on the night of the robbery. However, he admitted that he validated winning tickets from Hidden Carry-Out at Kroger and two Sunoco stores that evening. Appellant claimed he found "half a dozen or so" tickets folded up by the railroad tracks near the corner of Grant and Doan Streets and these were the tickets he cashed in. Appellant stated that he "usually find[s] a lot of * * * lottery tickets on the ground" or in trashcans, and that he frequently turns the tickets in to see if they are winners. Appellant did not tell the detectives about finding the tickets near Doan Street when he was interviewed on December 5, 2019, because he was "nervous" and "didn't

really think about it at the time."

{¶24} Appellant further testified that he shares the Mulberry Street apartment with six other people and stated that not all the items located within the apartment were his, as his roommates and guests frequently left items there. Appellant denied ownership of the black gloves with the white writing that were found in his bedroom, but stated that he may have worn them at some point to protect his hands when he was "scrapping or junking." He also denied ownership of the black toboggan and the drugs found in the apartment. However, he admitted that the brown coat found in the pillowcase in the living room belonged to him. Appellant testified that he was using the coat as a pillow, something he "used to do in the joint all the time."

{¶25} After considering the evidence presented at trial, the jury found appellant guilty of all charges. The matter proceeded to sentencing on May 29, 2020. In Case No. CRI 19-500-231, the trial court imposed an indefinite prison term of six to nine years for the robbery offense and a ten-month prison term for telecommunications fraud. The sentences were run concurrently with one another. In Case No. CRI 20-500-028, the trial court determined that the possession of heroin and possession of a fentanyl-related compound offenses were allied offenses subject to merger. The state elected to proceed on the conviction for possession of a fentanyl-related compound, and the trial court imposed a ten-month prison term on the offense. It also imposed a ten-month prison term on the aggravated possession of drugs conviction. The prison terms were run concurrently with one another and concurrently to the six-to-nine-year indefinite prison term imposed in Case No. CRI 19-500-231.

{¶26} Appellant appealed his convictions, raising two assignments of error for our review.

{¶27}   Assignment of Error No. 1:

{¶28}   THE TRIAL COURT ERRED BY ENTERING A CONVICTION FOR FELONY CHARGES WHEN THERE WAS INSUFFICIENT EVIDENCE FOR THE CONVICTION.

{¶29}   In his first assignment of error, appellant argues his convictions for robbery and telecommunications fraud are not supported by sufficient evidence and are against the manifest weight of the evidence.   Specifically, appellant maintains that there was no evidence "that proved the Hidden Carry-Out tickets cashed in the hours after the robbery were the tickets taken during the robbery."  He further argues there was no evidence proving he was the individual who committed the robbery.   Appellant does not challenge his convictions on the possession charges.

{¶30}   Whether the evidence presented at trial is legally sufficient to sustain a verdict is a question of law.  *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997); *State v. Grinstead*, 194 Ohio App.3d 755, 2011-Ohio-3018, ¶ 10 (12th Dist.).  When reviewing the sufficiency of the evidence underlying a criminal conviction, an appellate court examines the evidence in order to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt.  *State v. Paul*, 12th Dist. Fayette No. CA2011-10-026, 2012-Ohio-3205, ¶ 9.  Therefore, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶31}   On the other hand, a manifest weight of the evidence challenge examines the "inclination of the greater amount of credible evidence, offered at a trial, to support one side of the issue rather than the other."  *State v. Barnett*, 12th Dist. Butler No. CA2011-09-177, 2012-Ohio-2372, ¶ 14.  To determine whether a conviction is against the manifest weight

of the evidence, the reviewing court must look at the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving the conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Graham*, 12th Dist. Warren No. CA2008-07-095, 2009-Ohio-2814, ¶ 66. In reviewing the evidence, an appellate court must be mindful that the jury, as the original trier of fact, was in the best position to judge the credibility of witnesses and determine the weight to be given to the evidence. *State v. Blankenburg*, 197 Ohio App.3d 201, 2012-Ohio-1289, ¶ 114 (12th Dist.). An appellate court will overturn a conviction due to the manifest weight of the evidence "only in the exceptional case in which the evidence weighs heavily against the conviction." *Id.*, citing *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). Further, although the legal concepts of sufficiency of the evidence and weight of the evidence are quantitatively and qualitatively different, "[a] determination that a conviction is supported by the manifest weight of the evidence will also be dispositive of the issue of sufficiency." *State v. Jones*, 12th Dist. Butler No. CA2012-03-049, 2013-Ohio-150, ¶ 19.

{¶32} Appellant was convicted of robbery in violation of R.C. 2911.02(A)(2), which provides that "[n]o person, in attempting or committing a theft offense or in fleeing immediately after the attempt or offense, shall * * * [i]nflict, attempt to inflict, or threaten to inflict physical harm on another." Appellant was also convicted of telecommunications fraud in violation of R.C. 2913.05(A), which provides that "[n]o person, having devised a scheme to defraud, shall knowingly disseminate, transmit, or cause to be disseminated or transmitted by means of a wire, radio, satellite, telecommunication, telecommunications device, or telecommunications service any writing, data, sign, signal, picture, sound, or

image with purpose to execute or otherwise further the scheme to defraud." A person acts knowingly when, regardless of purpose, "the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature." R.C. 2901.22(B).

{¶33} After reviewing the record, weighing inferences and examining the credibility of the witnesses, we find that appellant's convictions for robbery and telecommunications fraud are supported by sufficient evidence and are not against the manifest weight of the evidence. The state presented testimony and evidence from which the jury could have found all the essential elements of the offenses proven beyond a reasonable doubt. The state established through Butts' testimony and video surveillance footage that an assailant entered Hidden Carry-Out at 8:53 p.m. on December 2, 2019 dressed in dark pants, a brown Carhartt-style jacket, a black toboggan hat with a white tag on it, and black gloves with white writing on the side. After striking Butts in the head and causing physical harm, the assailant took $450 cash and multiple Ohio lottery tickets. Surveillance footage showed the assailant looking for a specific game before choosing the Cashword game. According to Depak Patel, the owner of the store, the assailant did not have permission to take the cash from the register or the lottery tickets without paying.

{¶34} Contrary to appellant's assertions, neither law enforcement nor the state merely "guessed" what lottery tickets were stolen from Hidden Carry-Out during the robbery. Rather, the lottery tickets that were stolen were able to be determined through use of surveillance footage, consultation with Nayan Patel, who handled and kept track of the store's lottery shipments and sales, and use of records and reports from the Ohio Lottery Commission, which Grause testified about in detail. Grause, who was not cross-examined by defense counsel, explained that lottery tickets have an identifying number and can be tracked to see what store a ticket came from and what store the ticket was eventually

cashed. After being provided with the book numbers and the span of tickets taken during the robbery, Grause was able to determine that the stolen tickets had either been checked or cashed at four locations in Wilmington: the South Street Sunoco, the Sunoco on East Main Street, a Kroger, and a Shop N Go. He was also able to determine that some of the validations had occurred within one-half hour to two hours of the robbery. Surveillance footage of the validations demonstrated appellant was the individual cashing the tickets and that the stolen tickets were validated over a telecommunications service known as the Ohio lottery system.

{¶35} Items found in appellant's apartment provided strong circumstantial evidence that he was the individual who had robbed Hidden Carry-Out. As this court has previously recognized, "[t]he identity of the accused as the perpetrator of the crime may be established by direct or circumstantial evidence. * * * Circumstantial and direct evidence have the same probative value." *State v. Jividen*, 12th Dist. Warren No. CA2020-10-067, 2021-Ohio-2720, ¶ 11, citing *State v. Lee*, 12th Dist. Fayette Nos. CA2020-09-014 and CA2020-09-015, 2021-Ohio-2544, ¶ 25. Here, officers found a brown Carhartt-style jacket rolled up and hidden in a pillowcase, a black toboggan hat that contained a white tag, and black gloves with white writing on the side. All of these items appeared to match the clothing worn by the perpetrator of the robbery. DNA evidence tied appellant to the black gloves and the brown jacket. Also found in appellant's apartment were multiple Cashword tickets and a grey-blue jacket that looked like the jacket appellant wore when cashing the stolen lottery tickets. Although the Cashword tickets found in appellant's apartment were not the specific tickets taken from Hidden Carry-Out, the tickets were evidence of appellant's affinity for the Cashword game. An affinity that appellant later admitted to having when he told Detectives Baker and Juillerat that "pretty much all [he] do[es] is Cashword" tickets.

{¶36} Detective Juillerat testified about appellant's apartment's proximity to Hidden Carry-Out and the South Street Sunoco, where the first stolen lottery ticket was cashed about one-half hour after the robbery. Detective Juillerat testified appellant's apartment was "practically right in between" Hidden Carry-Out and the South Street Sunoco. He estimated that it would only take two or three minutes to get from Hidden Carry-Out to appellant's residence by car and stated that the two locations were easily within running distance of one another. He further testified that it would have been possible for appellant to stop and change clothing at his residence on Mulberry Street on his way from Hidden Carry-Out to the South Street Sunoco, noting that a "common prudent person" could probably "change a jacket * * * [in] 30 seconds to a minute."

{¶37} In finding appellant guilty, the jury was free to reject appellant's testimony that he had not committed the robbery but had merely found the lottery tickets by the railroad tracks near Doan Street and that he was unaware when validating the tickets that they had been stolen from Hidden Carry-Out. "[W]hen conflicting evidence is presented at trial, a conviction is not against the manifest weight of the evidence simply because the trier of fact believed the prosecution testimony." *State v. Lunsford*, 12th Dist. Brown No. CA2010-10-021, 2011-Ohio-6529, ¶ 17. When there is a conflict in the testimony of witnesses, it is for the trier of fact to determine the weight and credibility to be given to such evidence. *State v. Marcum*, 12th Dist. Butler No. CA2017-05-057, 2018-Ohio-1009, ¶ 31, citing *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. Furthermore, "it [is] within the province of the jury * * * to take note of any inconsistencies in the testimony and resolve them accordingly, believing all, part, or none of each witness's testimony." *State v. Lark*, 12th Dist. Fayette No. CA2018-03-004, 2018-Ohio-4940, ¶ 29. Given the inconsistencies between appellant's trial testimony, his statement to law enforcement

during the December 5, 2019 interview, wherein he failed to mention finding a stack of Cashword lottery tickets near the railroad tracks by Doan Street, and the physical evidence found in his apartment, the jury was entitled to reject's appellant's claims that he had not committed the robbery or knowingly validated the stolen lottery tickets as a part of a scheme to defraud others into paying cash prizes for the stolen tickets.

{¶38} Accordingly, for the reasons stated above, we find that appellant's convictions for robbery and telecommunications fraud are supported by sufficient evidence and are not against the manifest weight of the evidence. The trier of fact did not lose its way or create such a manifest miscarriage of justice that appellant's convictions must be reversed. We therefore overrule appellant's first assignment of error.

{¶39} Assignment of Error No. 2:

{¶40} APPELLANT WAS DENIED HIS RIGHT TO A SPEEDY TRIAL UNDER THE SIXTH AMENDMENT TO THE U.S. CONSTITUTION AND REVISED CODE R.C. 2945.71.

{¶41} In his second assignment of error, appellant argues he was denied his constitutional and statutory right to a speedy trial. Appellant contends that because he remained incarcerated after being arrested on December 5, 2019, the "triple-count" provision set forth in R.C. 2945.71(E) applied and the state was required to bring him to trial within 90 days. He further contends that the state's nearly sixth-month delay in bringing him to trial following his arrest violated his constitutional right to a speedy trial under the Sixth Amendment.

{¶42} R.C. 2945.73(B) provides that "[u]pon motion made at or prior to the commencement of trial, a person charged with an offense shall be discharged if he is not brought to trial within the time required by sections 2945.71 and 2945.72 of the Revised Code." However, "[i]f not timely asserted by motion prior to the commencement of trial,

speedy trial rights are waived." *State v. Miller*, 12th Dist. Butler No. CA98-06-129, 1999 Ohio App. LEXIS 5515, *15 (Nov. 22, 1999). *See also State v. Agostini*, 12th Dist. Warren Nos. CA2016-02-013 and CA2016-02-014, 2017-Ohio-4042, ¶ 57; *State v. Taylor*, 98 Ohio St.3d 27, 2002-Ohio-7017, ¶ 37.

{¶43} The record before us indicates appellant failed to move for a discharge based upon lack of a speedy trial. Appellant cannot raise a statutory speedy trial issue for the first time on appeal. *Id.; Agostini* at ¶ 58; State *v. Cassidy*, 12th Dist. Clermont No. CA85-05-036, 1985 Ohio App. LEXIS 9443, *2 (Dec. 2, 1985). His claim that his statutory speedy trial rights were violated is, therefore, without merit.

{¶44} Appellant's claim that his constitutional speedy trial rights were violated is also without merit. The United States Supreme Court set forth a balancing test that considers the following four factors in determining whether trial delays were reasonable under the Sixth and Fourteenth Amendments to the United States Constitution: (1) the length of delay, (2) the reason the government assigns to justify the delay, (3) the defendant's assertion of his right to a speedy trial, and (4) the prejudice to the defendant. *Barker v. Wingo*, 407 U.S. 514, 530-532, 92 S.Ct. 2182 (1972). *See also Taylor* at ¶ 38. "The first factor, the length of the delay, is a 'triggering mechanism,' determining the necessity of inquiry into the other factors." *State v. Triplett*, 78 Ohio St.3d 566, 569 (1997). Unless there is some delay which is "presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance." *Barker* at 530. Post-accusation delay approaching one year is generally found to be presumptively prejudicial. *Doggett v. United States*, 505 U.S. 647, 652, fn. 1, 112 S.Ct. 2686 (1992); *Triplett* at 569.

{¶45} In the present case, 174 days passed between the time appellant was arrested on December 5, 2019 and the time his jury trial commenced on May 27, 2020.

This delay is not presumptively prejudicial and there is no need for this court to consider the additional *Barker* factors. *See State v. Carpenter*, 12th Dist. Butler No. CA2019-03-044, 2019-Ohio-4829, ¶ 27 (finding no need to consider the remaining *Barker* factors as the 132-day delay between arrest and trial was not presumptively prejudicial). Appellant's constitutional right to a speedy trial was not violated.

{¶46} Having found no merit to appellant's arguments, we overrule his second assignment of error.

{¶47} Judgment affirmed.

PIPER, P.J., and S. POWELL, J., concur.