{¶ 1} Defendant-appellant, Todd Huston, appeals his conviction in the Fayette County Court of Common Pleas for complicity to felonious assault.
 {¶ 2} Appellant was indicted in August 2005 on one count of complicity to felonious assault. The charge stemmed from allegations that in the early hours of February 5, 2005, appellant helped his wife Christine Huston ("Christie") assault Donald Majors ("Donald") with *Page 2 
a baseball bat on a parking lot in Washington Court House, Ohio. At the time of the incident, appellant and Christie were separated. Christie wanted to date Donald. Donald did not feel the same about Christie. Appellant pled not guilty to the charge, claiming that at the time of the incident he was playing cards with friends in Waverly, Ohio. On May 4, 2006, following a jury trial, appellant was found guilty as charged. Appellant appeals, raising three assignments of error which will be addressed out of order.
 {¶ 3} Assignment of Error No. 2:
 {¶ 4} "THE COURT ERRED IN OVERRULING A [CRIM.R. 29(A)] MOTION MADE AT THE CLOSE OF THE STATE'S CASE."
 {¶ 5} Crim.R. 29(A) provides that a trial court may order a judgment of acquittal if the evidence is insufficient to sustain a conviction. An appellate court reviews the denial of a Crim.R. 29(A) motion under the same standard as for a claim of insufficient evidence, to wit: "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus.
 {¶ 6} Appellant was convicted of complicity to felonious assault, in violation of R.C. 2903.11(A)(1), which states: "No person shall knowingly cause serious physical harm to another or to another's unborn;" and R.C. 2923.03(A)(2), which states: "No person, acting with the kind of culpability required for the commission of the offense, shall aid or abet another in committing the offense." On appeal, appellant argues that in light of the fact that *Page 3 
(1) the only evidence presented by the state was in the form of Donald's testimony, (2) because Donald was "drunk pretty good" during the assault, his testimony was not credible, and (3) Donald was on probation at the time of the assault, the evidence introduced at trial was insufficient to convict him. We disagree.
 {¶ 7} Donald testified that he met Christie at the RendezVous Room, a bar in Washington Court House, on February 4, 2005. They later went to the Country Connection, another local bar. They left that bar around 1:30 or 2:00 in the morning; Christie was driving. Instead of going to Donald's house as planned, Christie pulled over in a parking lot near the city swimming pool and parked. Soon after, another vehicle pulled in the parking lot and up to Christie's car, blocking Donald's passenger door. Unable to leave through that door, Donald climbed over Christie to exit the car. Once out of the car, he saw appellant come running around the car, telling Christie "to do it, do it now." Donald testified that he was then struck several times with what he believed to be a baseball bat by both appellant and Christie. During the assault, he heard appellant tell Christie "to hit him, get him now."
 {¶ 8} After appellant and Christie drove off, Donald went to some friends' house, Sarah and Gordon Kratzer, that was close by. Donald told them that he had just been assaulted by appellant and Christie. Donald refused to go to the hospital but eventually relented after they all agreed he would make up a story as to what had happened to him (to wit, he had slipped and fell on the ice and hit his head on the concrete ground). At the hospital, at the prompting of the Kratzers, Donald eventually told the hospital personnel the truth. Donald testified it took him about three weeks before he could go back to a normal routine at work. On cross-examination, Donald admitted that although he was on probation at the time, he went to the foregoing bars where he drank alcohol, and that he was "drunk pretty good" that night. *Page 4 
 {¶ 9} Donald also testified about two other incidents involving appellant. The first incident involved appellant leaving a message on Jesse Wheaton's cell phone in early 2005, asking Wheaton to tell Donald he "was a pussy, pussy, pussy." Wheaton played the message for Donald. Wheaton, Donald, and appellant at one time worked together for the same company. The other incident took place in the late summer of 2005 at the Chillicothe Biker Rodeo. Donald testified that the second time he and his friend Anthony Adkins walked by appellant's campsite, appellant, holding a ball bat, said: "I thought I killed you, you S.O.B."
 {¶ 10} In addition to Donald's testimony, the state presented the testimony of Jesse Wheaton, Anthony Adkins, Sarah and Gordon Kratzer, Dr. Robert Richter, and three Washington Court House police officers. Wheaton testified that in early 2005, appellant left a voice mail on his cell phone stating: "Jesse this is Todd Huston. Tell Donnie he's a pussy. * * * I challenged him the other night and he wouldn't fight me. [W]e can still be buds * * * just tell Donnie he's a pussy, pussy, pussy, pussy." Wheaton played the message for several people, including Donald. Appellant "didn't sound like he was upset, didn't sound like he was joking around[.]"
 {¶ 11} Anthony Adkins and Donald went to the Chillicothe Biker Rodeo in the summer of 2005. Adkins testified they were walking around when they came upon appellant's campsite. Once appellant and Donald recognized one another, "[appellant] jumped up and went to the back of his van and grabbed a baseball bat and he looked at him and he said I thought I killed you, you S.O.B. and Donnie said no I'm here and he said well if I didn't succeed the first time I will this time, and at that time I was trying to watch my back and keep Donnie away from him[.]" The police were notified and appellant and Donald were both ejected from the rodeo.
 {¶ 12} Sarah and Gordon Kratzer testified they were awakened on February 5, 2005 *Page 5 
around 2:00-2:30 a.m. by Donald pounding on their front door. According to Sarah, Donald had messy hair and blood all over him and was drunk. According to Gordon, Donald was aggravated, frustrated, scared, drunk, looking beat up and bloody with bruises. Once Donald calmed down, he told them how appellant and Christie assaulted him with a baseball bat, but refused to go to the hospital. About an hour later, after his body started to warm up, Donald began bleeding from the back of his head. At the Kratzers' insistence, he agreed to go to the hospital. The Kratzers and Donald agreed they would tell the hospital personnel he had slipped on the ice and hit his head on the concrete ground. According to Sarah, this is the only way Donald agreed to go to the hospital. Sarah testified that she and her husband, however, planned to tell the truth at the hospital unbeknownst to Donald. At the hospital, after first telling the concocted story, Donald eventually told the truth at the Kratzers' insistence.
 {¶ 13} Appellant was related by marriage to the Kratzers; Christie was their niece. Sarah admitted she did not like appellant. Gordon testified that he went to the scene of the assault to help Donald find his hat and cell phone. There, next to Donald's hat, Gordon observed a six-inch puddle of what he assumed was blood.
 {¶ 14} Dr. Robert Richter, an emergency room physician, treated Donald on February 5, 2005 around 3:00 a.m. Donald had a "four inches long gaping, wide" laceration on the back of his head as well as some contusions and a small laceration over the left hip area. Dr. Richter testified that Donald first told him the concocted story but eventually told him the truth about his injuries at the insistence of family members. Dr. Richter also testified that Donald's head laceration was not consistent with a fall. Rather, the laceration "looked more like a laceration from a blunt object."
 {¶ 15} The Washington Court House police officers involved in the investigation of the *Page 6 
assault testified they were unable to find evidence of the assault either in Christie's car or on the parking lot. Christie provided a short written statement several hours after the assault. The statement placed Christie with Donald at the scene of the assault; the statement did not mention the assault or appellant. The statement was written at Christie's house. At that time, Christie appeared very abrupt, somewhat nervous, and uncomfortable. During a follow-up interview several days later, Christie continually looked down, would not look the detective in the eye, and was "basically squirming in her chair." In addition, her demeanor was almost defensive. Christie's oral statement during the follow-up interview matched her previous written statement.
 {¶ 16} Upon reviewing all of the foregoing evidence in a light most favorable to the prosecution, we conclude that a rational trier of fact could find that the elements of the offense were proved beyond a reasonable doubt, that is, that appellant knowingly aided or abetted Christie in the felonious assault of Donald. We therefore find that appellant's conviction for complicity to felonious assault was supported by sufficient evidence. Appellant's second assignment of error is overruled.
 {¶ 17} Assignment of Error No. 1:
 {¶ 18} "THE DECISION OF THE COURT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND THE JURY'S VERDICT WAS INCONSISTENT WITH THE EVIDENCE AND TESTIMONY PRESENTED AT TRIAL."
 {¶ 19} Appellant argues that in light of the fact that (1) the only witness to the alleged assault was Donald, (2) because Donald was "drunk pretty good" during the assault, his testimony was not credible, and (3) appellant presented testimony he was not involved with the assault because he was playing cards in a different city, the jury clearly lost its way and created a miscarriage of justice when it found him guilty as charged. *Page 7 
 {¶ 20} A challenge to the manifest weight of the evidence attacks the credibility of the evidence presented. State v. Thompkins,78 Ohio St.3d 380, 386-387, 1997-Ohio-52. When reviewing whether a conviction is against the manifest weight of the evidence, an appellate court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. An appellate court should vacate a conviction and grant a new trial only when the evidence weighs heavily against the conviction. Id. at 387. An appellate court will not reverse a judgment as against the manifest weight of the evidence in a jury trial unless it unanimously disagrees with the jury's resolution of any conflicting testimony. Id. at 389. When reviewing the evidence, an appellate court must be m indful that the original trier of fact was in the best position to judge the credibility of witnesses and the weight to be given the evidence. State v. DeHass (1967),10 Ohio St.2d 230, paragraph one of the syllabus.
 {¶ 21} Following the close of the state's case and the denial of his Crim.R. 29 motion, appellant presented the testimony of Thomas Price and Jim Bowman, two fellow card players. Both testified that (1) they typically played cards with appellant every weekend in Waverly, Ohio from 9 p.m. to about 2 a.m. when the beer would run out; (2) they played cards with appellant until about 2 a.m. on February 5, 2005 (the morning of the assault); and (3) they remembered that game because the following evening, appellant told them how the police searched Christie's car.
 {¶ 22} Price also testified that (1) during the card game which ended in the early hours of February 5, 2005, he drank about a 12-pack of beer; (2) if he is in a rush, he can drive the distance between Waverly and Washington Court House (the city where the assault took *Page 8 
place) in 45 minutes; (3) he was 100 percent sure appellant did not have time in the morning of February 5, 2005 to leave the game and drive back to Washington Court House before 2 a.m.; and (4) appellant and Christie got back together about a month after the assault incident. Bowman testified that Christie started playing cards with them about a month after the assault incident.
 {¶ 23} Appellant testified on his own behalf. Appellant denied any involvement in the assault incident, denied giving a bat to Christie, and denied being at the scene of the assault. Appellant testified that (1) in the early morning hours of February 5, 2005, he was playing cards in Waverly; (2) they played cards that morning until about 2:30 a.m.; (3) he was back in Chillicothe, Ohio at about 3 a.m.; and (4) he remembered that card game because later that day, Christie's car was searched by the police. Appellant denied leaving the "pussy" voice mail on Wheaton's cell phone. With regard to the rodeo, appellant testified that he was threatened by Donald and Donald's friend and that he stepped behind his couch to get away from Donald. Appellant testified he had a walking cane in his hand, not a bat.
 {¶ 24} After a careful review of the record, we cannot conclude that the jury lost its way and committed a manifest miscarriage of justice in convicting appellant of complicity to felonious assault. Although appellant denied any involvement in the assault or that he was in Washington Court House at the time of the assault, and presented testimony he was playing cards with friends in Waverly, we refuse to overturn the verdict because the jury did not believe the testimony presented on appellant's behalf. "[W]hen conflicting evidence is presented at trial, a conviction is not against the manifest weight of the evidence simply because the jury believed the prosecution testimony." State v. White, Butler App. No. CA2003-09-240,2004-Ohio-3914, ¶ 28. Appellant's conviction for complicity to felonious assault is not against the manifest weight of the evidence. Appellant's first assignment of *Page 9 
error is overruled.
 {¶ 25} Assignment of Error No. 3:
 {¶ 26} "THE COURT ERRED BY OVERRULING DEFENDANT'S OBJECTION AND ADMITTING INTO EVIDENCE A STATEMENT OF THE DECEASED CO-DEFENDANT CONTRARY TO EVIDENCE RULE."
 {¶ 27} Several hours after the assault incident, Christie provided a written statement to the police. The statement is short and states that after briefly staying at the RendezVous Room with Donald, the two of them went to the Country Connection where they stayed until about 2 a.m. on February 5, 2005; they then drove to the pool parking lot where they had an argument; Donald got out of her car and she drove back home where she arrived at about 2:30 a.m. Christie died in a car accident in March 2006 before appellant's trial. At trial, the parties stipulated to her obituary as evidence of her death.
 {¶ 28} At trial, the state sought to admit her statement under Evid.R. 804(B)(3), arguing that the statement was against Christie's penal interest because it placed her at the scene at the time of the assault. Following the close of the state's case, the trial court admitted the statement into evidence under Evid.R. 804(B)(3) over appellant's objection. On appeal, appellant argues that the trial court erred by admitting the statement into evidence because the statement, which is clearly hearsay, does not fall within the exception to hearsay under Evid.R. 804(B)(3).
 {¶ 29} Evid.R. 804(B)(3) provides in pertinent part that "[t]he following [is] not excluded by the hearsay rule if the declarant is unavailable as a witness: Statement against interest. A statement that was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, * * * that a reasonable person in the declarant's position would not have made the statement *Page 10 
unless the declarant believed it to be true. A statement tending to expose the declarant to criminal liability, whether offered to exculpate or inculpate the accused, is not admissible unless corroborating circumstances clearly indicate the truthworthiness of the statement." A declarant is unavailable if he "is unable to be present or to testify at the hearing because of death[.]" Evid.R. 804(A)(4).
 {¶ 30} Crim.R. 52(A) governs harmless error and states that "[a]ny error * * * which does not affect substantial rights shall be disregarded." The admission of hearsay may be harmless if it does not affect the defendant's substantial rights. See State v. Fleming, Butler App. No. CA2002-11-279, 2003-Ohio-7005. We note that Christie's statement does not implicate appellant at all and in fact never mentions him. Given the testimony of Donald, Adkins, and the Kratzers, and the evidence of appellant's guilt, we find that the outcome of appellant's trial would not have been different had Christie's statement not been admitted. Thus, we find that the admission of Christie's statement, if erroneous, was harmless beyond a reasonable doubt. See State v.Madrigal, 87 Ohio St.3d 378, 2000-Ohio-448. Appellant's third assignment of error is overruled.
 {¶ 31} Judgment affirmed.
 BRESSLER and POWELL, JJ., concur. *Page 1