[Cite as *State v. Maloney*, 2023-Ohio-2711.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Appellee, | : | CASE NO. CA2022-07-069 |
| - vs - | : | O P I N I O N<br>8/7/2023 |
| MICHAEL LEE MALONEY, | : | |
| Appellant. | : | |

APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
Case No. CR2022-01-0001

Michael T. Gmoser, Butler County Prosecuting Attorney, and Michael Greer, Assistant Prosecuting Attorney, for appellee.

Christopher P. Frederick, for appellant.

**BYRNE, J.**

{¶ 1} The Butler County Court of Common Pleas convicted Michael Lee Maloney of one count of aggravated burglary and two counts of felonious assault. Maloney appealed his aggravated burglary conviction, but not his felonious assault convictions. We affirm the aggravated burglary conviction. Maloney also appealed several aspects of his sentence. We conclude that the trial court was required to merge the aggravated burglary conviction with the two felonious assault convictions for purposes of sentencing. Accordingly, we vacate Maloney's sentence and remand for resentencing.

## I. Factual and Procedural Background

{¶ 2}   In January 2022, a Butler County grand jury indicted Maloney on one count of aggravated burglary (Count One) and two counts of felonious assault (Count Two and Count Three).  All three counts included a specification that Maloney was a repeat violent offender.[1]  The indictment stemmed from allegations that Maloney trespassed into the victims' home with a container of vegetable oil.  He then proceeded to heat the vegetable oil in a pot on the kitchen stove.  He then carried the pot of hot oil to a second-floor bedroom where he threw the pot and oil onto the victims – a mother and her infant son – while they lay sleeping in bed.

### A. The Trial

{¶ 3}   The matter proceeded to a multiple-day jury trial.  We will summarize the witness testimony and evidence that is relevant to analyzing this appeal.

### 1. Bonny Mata's Testimony

{¶ 4}   Bonny Mata testified that he lived at 1721 Grand Boulevard, Hamilton, Ohio.  He lived there with his girlfriend, Jayla Witt, and their son, Tobias.  Tobias was 17 months old on the date of the incident.  Bonny knew Maloney through Jayla.  Bonny was aware that Jayla and Maloney were related.

{¶ 5}   According to Bonny, Jayla drove to Kentucky and picked up Maloney in December 2021.  Jayla told Bonny that Maloney would be staying with them for "a couple of days."  In fact, Maloney stayed at 1721 Grand Boulevard from approximately December 6 or 7 through December 18, 2021, or approximately 11 to 12 days.

---

1. Maloney was previously convicted of voluntary manslaughter.  He beat the victim with a baseball bat over an argument related to a drug deal.  The victim subsequently died.  *State v. Maloney*, 12th Dist. Butler No. CA2001-01-014, 2002 WL 237344 (Feb. 19, 2002).

{¶ 6} On December 21, 2021, Bonny stated that he left for work between 4:50 a.m. and 5:30 a.m. When he left, Jayla and Tobias were the only people in the home. They were in bed, in the second-floor bedroom. No one else was supposed to be at the home. Bonny left through the home's back door and locked the door. Bonny testified that prior to that day, the glass window in the home's back door had been broken and then removed. Bonny was in the process of replacing the glass, but in the meantime, he had covered the window with cardboard and used tape to secure the cardboard.

{¶ 7} After leaving the home, Bonny received a phone call from Jayla's mother, Donrenee Maloney. Donrenee was living at the Cove Motel, which was approximately eight to ten minutes away from Bonny's home on foot. Donrenee told Bonny that something had happened to Jayla. He drove to the Cove Motel, picked up Donrenee, and then they traveled together to the hospital.

**2. Jayla Witt's Testimony**

{¶ 8} Jayla testified that Maloney was her second cousin and her mother Donrenee's first cousin. In early December, Maloney called Donrenee and said he was having problems with homelessness. Donrenee asked Jayla to pick Maloney up and told her that he was walking down the side of a highway in Kentucky. Jayla drove with a friend and picked Maloney up in Kentucky. Jayla then dropped Maloney off at Donrenee's room at the Cove Motel.

{¶ 9} Jayla testified that Maloney stayed at the Cove Motel for two days. She then picked Maloney up and he began staying at her home, 1721 Grand Boulevard, sleeping on the sofa. During this time, Maloney had no car and no job. He did not pay rent to stay at 1721 Grand Boulevard. Jayla gave him car rides when he needed to go places.

{¶ 10} Jayla testified that while Maloney was staying at her home, he sold her $200

worth of food stamps. Jayla paid Maloney $100 for the food stamps, which she was not happy about. Jayla explained that, when sold on the street, food stamps could normally be purchased for half their face value. The fact that Maloney had sold her food stamps for the normal street price bothered her. Given that she was providing Maloney with free food and shelter, she did not feel that she should have had to pay the normal price for the food stamps. She "vented" to Donrenee about this issue.

{¶ 11} After Jayla vented to Donrenee about the food stamps, Maloney stopped staying at 1721 Grand Boulevard. The same day Maloney sold her the food stamps, Jayla dropped Maloney off to stay with her aunt, where he lived for no more than 24 hours before returning to live at the Cove Motel.

{¶ 12} On the morning of December 21, Jayla went to bed very early in the morning, at around 3:00 a.m. or 3:30 a.m. Jayla stated that she was having difficulty getting Tobias to go to sleep. She recalled Bonny leaving in the morning and putting Tobias into bed with her.

{¶ 13} Jayla then woke up because she felt like she was "on fire." She fell out of bed, rubbed her face, grabbed Tobias, and ran to the bathroom and sprayed water on herself and Tobias. She did not see anyone in the home but heard someone going down the stairs.

{¶ 14} Jayla called 9-1-1. She also called Maloney's phone, which was how she communicated with her mother. She told Maloney, "Uncle Mike, I'm burning, I'm burning." Afterwards, she remembered a police officer taking photographs.[2] Jayla lost consciousness after getting onto an ambulance gurney. The next thing she remembered was waking up in

---

2. An officer took photographs of Jayla and Tobias shortly after arriving on scene. The photographs depict the extent and severity of the injuries the two suffered in the hot oil attack.

the Dayton Burn Unit, some 40 days later.

{¶ 15} Jayla agreed that it was beyond her "wildest imagination" that Maloney could have done this to her. Jayla stated that it was even more shocking because she had fed and sheltered Maloney. She could not believe that he could walk up 18 steps to her bedroom carrying a pot of hot oil.

{¶ 16} The state introduced photographs documenting the extent of the injuries suffered by Jayla and Tobias. Jayla testified about the numerous surgeries and the physical and mental effects the attack had on her and Tobias. Jayla and Tobias suffered severe, permanent injuries and significant disfigurement. Both will require ongoing significant surgeries or medical care.

### 3. Detective Tony Nichting's Testimony, the Video Evidence, and the Interviews

{¶ 17} Detective Nichting was the lead investigator on the case. He testified that he and other detectives canvassed the area around 1721 Grand Boulevard for security cameras in an effort to identify the perpetrator of the attack. As a result of that canvas, the detectives were able to recover video footage from a camera in the alleyway behind 1721 Grand Boulevard, from various businesses, and from the city of Hamilton's maintenance lot. Based on the video evidence and a positive identification by Bonny, investigators were able to identify Maloney as a suspect.

{¶ 18} During Detective Nichting's testimony, the state played an exhibit that consisted of a sequence of select video footage produced from all of the video footage recovered by detectives. The compilation began with security camera footage at the Cove Motel at approximately 7:00 a.m. on December 21, 2021. In the video, Maloney emerges from Room 114 wearing a dark hoodie with a large, white Nike logo. The Nike logo is so prominent that it makes him easily identifiable in subsequent video footage, even where he

is farther away from the camera, or the picture quality is poorer.

{¶ 19} A few minutes after emerging from Room 114, Maloney walks to and briefly enters Room 135, which was Donrenee's room. Maloney then leaves Room 135 and proceeds north on Route 4, on foot. He is then captured by a series of cameras walking north on Route 4. He is eventually recorded entering a Kroger grocery store. Maloney then appears on camera inside Kroger at the self-checkout area. He purchases a single item: a plastic bottle of vegetable oil. He pays cash but uses his "Kroger Plus" member ID.[3]

{¶ 20} After leaving Kroger, security camera footage depicts Maloney in the alleyway behind 1721 Grand Boulevard at approximately 7:30 a.m. He appears to change his clothing. He then walks towards the home, out of camera sight. Twenty minutes later, he is observed fleeing from the home through the same alley. Various cameras then capture Maloney as he makes his way back to the Cove Motel. During this time, he deposits an unknown item into a Rumpke dumpster. (By the time officers recovered the footage of Maloney dumping the item, the Rumpke dumpster had been emptied.)

{¶ 21} Detective Nichting also testified about his examination of the bedroom where the attack occurred. He found a pot that had been buried under some covers in Jayla's bedroom. He photographed various pillows and sheets that had been burned by the hot oil. Detective Nichting also shot a video in which he documented the path Maloney would have had to take to travel from the kitchen to Jayla's bedroom carrying the pot of oil. That video was played at trial and showed that in his effort to carry the hot oil, Maloney would have been required to traverse a 17-step staircase.

---

3. The camera system did not have sufficient fidelity to visually identify the item Maloney purchased. However, a store manager was able to locate the receipt for the item purchased at the self-check-out, which confirmed that Maloney purchased vegetable oil.

{¶ 22} Detective Nichting testified that on December 27, 2021, he returned to 1721 Grand Boulevard because Bonny had informed him that he found a vegetable oil bottle in the home that he did not recognize. The bottle, which was in the kitchen, had some oil left in it, but was mostly empty. Police processed the bottle for fingerprints but were unsuccessful in developing any fingerprints.

{¶ 23} Detective Nichting received information that Maloney had left the Cove Motel and traveled to Kentucky, where he was living in a homeless shelter. On December 27, 2021, police in Covington, Kentucky arrested Maloney. Detective Nichting then interviewed Maloney in a recorded interview that was introduced into evidence at trial.

{¶ 24} In the interview, Maloney told Detective Nichting that at 8:00 a.m. on December 21, he received a call from Jayla asking to speak with her mom. He left the Cove Motel two hours later. He got a ride from a resident of Room 114. Maloney denied ever being anywhere other than the Cove Motel that morning. However, upon subsequent questioning, he stated that he had gone to a gas station at around 5 or 6 in the morning, to get cigarettes. Maloney specifically denied going to Kroger that morning.

{¶ 25} Detective Nichting then informed Maloney that he had been observed on various security camera systems leaving the Cove Motel and that he was recorded in Kroger purchasing vegetable oil and had also been caught on camera in the alley behind Jayla's home immediately before the incident.

{¶ 26} Maloney then admitted that he had, in fact, gone to see Jayla that morning. He stated that he arrived at her home shortly after 7:00 a.m. But Maloney said that when he entered the home, Jayla was already screaming. He said he was there when the "dude did it." He could not provide a name for the "dude." Maloney admitted that he bought the vegetable oil and said that he bought it for Jayla.

{¶ 27} During this interview, Maloney had a bandage wrapped around one of his fingers. Detective Nichting asked if he could see under the bandage. Maloney refused to show him what was under the bandage. At the end of the interview, Maloney stated that he would speak to Detective Nichting another time to discuss what happened.

{¶ 28} On December 29, 2021, Detective Nichting obtained a search warrant authorizing him to examine Maloney's finger injury. Upon examining the injury, it was revealed to be a severe burn wound.

{¶ 29} Also on December 29, 2021, Detective Nichting interviewed Maloney again, at Maloney's request. For the first time, Maloney admitted that he poured hot oil on Jayla and Tobias. However, he stated that what happened was an "accident." Maloney explained that he went over to Jayla's home as a "surprise," and that he was going to cook breakfast for her. He walked up the stairs with the pot of oil because he wanted to let her know that he was there. But, upon entering the room, he "spooked" Jayla. Her reaction caused him to jump, and then he dropped the pot of oil on her and Tobias. He said he did not know Tobias was in the room with her. After he accidentally dropped the pot of hot oil, he "panicked" and ran away from the home.

## B. Crim.R. 29 Motion, the Verdict, and Sentencing

{¶ 30} After the state rested its case, Maloney moved for acquittal pursuant to Crim.R. 29. The trial court denied the motion. Maloney rested without presenting evidence.

{¶ 31} The jury returned guilty verdicts on all three counts. At sentencing, Maloney's counsel argued that the aggravated burglary count should merge with the two felonious assault counts. Maloney's counsel stated that the aggravated burglary and felonious assaults all stemmed from the same pattern of conduct and that the jury had been instructed that to find Maloney guilty of aggravated burglary, it was also required to find Maloney guilty

of felonious assault.

{¶ 32} The state responded by arguing that the aggravated burglary was committed when Maloney decided to take the pot of hot oil up the steps to Jayla's bedroom. The state explained that aggravated burglary only required an attempt to inflict physical harm, and so the decision to carry the hot oil up the stairs completed an "attempt" of the offense. Thus, the state argued that Maloney committed the felonious assault offenses separately from the aggravated burglary when he poured or threw hot oil on Jayla and Tobias.

{¶ 33} The court agreed with the state and found that the offenses were committed separately and were not allied. Therefore, the court found that the offenses did not merge for sentencing purposes. The court then imposed an indefinite prison sentence of a minimum of 11 years to a maximum of 16.5 years on Count One. The court imposed sentences of eight years on both Counts Two and Three. The court additionally imposed a ten-year consecutive term for the three repeat violent offender specifications. The court indicated that it would run all the sentences consecutively.[4] In total, the court imposed a mandatory indefinite prison term of 37 years up to 42 and one-half years in prison.

{¶ 34} Maloney appealed, raising five assignments of error. We address those assignments of error out of the order presented.

## II. Law and Analysis

### A. Sufficiency and Weight of the Evidence

{¶ 35} Maloney's Fourth Assignment of Error states:

---

4. At sentencing, the court indicated that it was ordering Maloney to serve all sentences consecutively. However, the sentencing entry indicates that the court only ran Counts Two and Three consecutively with Count One, and not consecutively with one another. That is, the sentencing entry does not reflect that the court ordered Count Three to be run consecutively to Count Two. The presumption therefore would be a concurrent sentence as between Counts Two and Three. However, because we are vacating Maloney's sentence on other grounds, this issue is moot and will presumably be clarified upon resentencing.

{¶ 36} MR. MALONEY'S RIGHT TO DUE PROCESS OF LAW UNDER THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION WAS VIOLATED AS THE TRIAL COURT IMPROPERLY DENIED HIS MOTION FOR JUDGMENT OF ACQUITTAL UNDER CRIMINAL RULE 29 AFTER THE STATE PRESENTED INSUFFICIENT EVIDENCE TO CONVICT HIM OF AGGRAVATED BURGLARY.

{¶ 37} Maloney's Fifth Assignment of Error states:

{¶ 38} MR. MALONEY'S CONVICTION FOR AGGRAVATED BURGLARY WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 39} In his fourth assignment of error, Maloney contends that the state submitted insufficient evidence to demonstrate that he "trespassed"—an element of the aggravated burglary charge—into 1721 Grand Boulevard.  Specifically, he argues that the state failed to submit evidence that he entered 1721 Grand Boulevard without a privilege to do so. Maloney presents the same argument in support of his fifth assignment of error and contends that the evidence weighed heavily in favor of acquittal on the aggravated burglary conviction, and that the aggravated burglary conviction was therefore against the manifest weight of the evidence.

## 1. Standards of Review

{¶ 40} Crim.R. 29(A) provides that "[t]he court on motion of a defendant or on its own motion, after the evidence on either side is closed, shall order the entry of a judgment of acquittal * * * if the evidence is insufficient to sustain a conviction of such offense or offenses."  An appellate court reviews the denial of a Crim.R. 29(A) motion under the same standard as that used to review a sufficiency-of-the-evidence claim.  *State v. Mota*, 12th Dist. Warren No. CA2007-06-082, 2008-Ohio-4163, ¶ 5; *State v. Huston*, 12th Dist. Fayette

Nos. CA2006-05-021 and CA2006-06-022, 2007-Ohio-4118, ¶ 5.

{¶ 41} When reviewing the sufficiency of the evidence underlying a conviction, an appellate court examines the evidence to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Paul*, 12th Dist. Fayette No. CA2011-10-026, 2012-Ohio-3205, ¶ 9. Therefore, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶ 42} A manifest weight of the evidence challenge examines the "inclination of the greater amount of credible evidence, offered at a trial, to support one side of the issue rather than the other." *State v. Barnett*, 12th Dist. Butler No. CA2011-09-177, 2012-Ohio-2372, ¶ 14. To determine whether a conviction is against the manifest weight of the evidence, the reviewing court must look at the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving the conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed, and a new trial ordered. *State v. Graham*, 12th Dist. Warren No. CA2008-07-095, 2009-Ohio-2814, ¶ 66.

{¶ 43} In reviewing the evidence, an appellate court must be mindful that the original trier of fact was in the best position to judge the credibility of witnesses and determine the weight to be given to the evidence. *State v. Blankenburg*, 197 Ohio App.3d 201, 2012-Ohio-1289, ¶ 114 (12th Dist.). An appellate court will overturn a conviction due to the manifest weight of the evidence only in the exceptional case in which the evidence weighs heavily against the conviction. *State v. Zitney,* 12th Dist. Clinton No. CA2020-06-007, 2021-Ohio-

466, ¶ 15.  A determination that a conviction is supported by the manifest weight of the evidence will also be dispositive of the issue of sufficiency.  *State v. Reeder*, 12th Dist. Clinton Nos. CA2020-09-012 and CA2020-09-013, 2021-Ohio-2988, ¶ 31.

### 2. Analysis of Aggravated Burglary Conviction

{¶ 44} The jury found Maloney guilty of aggravated burglary in violation of R.C. 2911.11(A)(1).  That statute provides, in relevant part, that,

> No person, by force, stealth, or deception, shall trespass in an occupied structure * * * when another person other than an accomplice of the offender is present, with purpose to commit in the structure or in the separately secured or separately occupied portion of the structure any criminal offense, if * * * The offender inflicts, or attempts or threatens to inflict physical harm on another * * *.

The definition of "aggravated burglary" requires that an offender "trespass" in an occupied structure.  *Id.*  The offense of criminal "trespass," as pertinent here, is defined as "[n]o person, without privilege to do so, shall * * * Knowingly enter or remain on the land or premises of another * * *."  R.C. 2911.21(A)(1).  "Privilege is the distinguishing characteristic between unlawful trespass and lawful presence on the land or premises of another." *State v. Roland*, 12th Dist. Butler No. CA2012-05-104, 2013-Ohio-1382, ¶ 17.  Privilege is defined statutorily as "an immunity, license, or right conferred by law, bestowed by express or implied grant, arising out of status, position, office, or relationship, or growing out of necessity." R.C. 2901.01(A)(12).  Where a defendant lacks a privilege to enter the premises of another, entry constitutes trespass.  *Roland* at *id.*

{¶ 45} Maloney argues that there was insufficient evidence to support his aggravated burglary conviction because he could not have trespassed, as a legal matter, as he had a privilege to enter and remain at 1721 Grand Boulevard.  Maloney states that Jayla allowed him to live at 1721 Grand Boulevard for 11 to 12 days before the incident, and that the

- 12 -

evidence at trial was that neither Jayla nor Bonny directly told him that he could no longer stay at the home. He points out that he had no other permanent residence, and he was never formally evicted from 1721 Grand Boulevard. He argues that he was a legal resident of 1721 Grand Boulevard with the right to be in the home. For the same reasons, he argues that the evidence weighed heavily in favor of an acquittal on the aggravated burglary charge.

{¶ 46} Upon our review of the record, we find that there was sufficient evidence to allow a reasonable factfinder to conclude that Maloney lacked a privilege to enter 1721 Grand Boulevard on the morning of December 21, 2021. We also find that this conclusion was not against the manifest weight of the evidence.

{¶ 47} The evidence at trial indicated that Maloney was homeless when Jayla picked him up in Kentucky in early December. Following that pick-up, Maloney stayed with Donrenee at her motel room. He was there for two days before he began residing with Jayla and Bonny. According to Bonny, Maloney was only supposed to be with them for two days but continued staying there for up to 12 days. Maloney then left 1721 Grand Boulevard and lived with Jayla's aunt for a very short time. He then returned to living at the Cove Motel, possibly with Donrenee, and possibly in another room in the motel. The evidence therefore indicates that Maloney was living an itinerant lifestyle, never staying in one place for any significant period of time. These facts do not support the argument that Maloney established residency at 1721 Grand Boulevard. Instead, the facts indicated that Maloney was staying at 1721 Grand Boulevard temporarily, and that this temporary stay ended two or three days before he entered the home and poured hot oil on Jayla and Tobias.

{¶ 48} Further, there was direct evidence supporting the contention that Maloney did not have permission to enter 1721 Grand Boulevard on the morning of December 21, 2021.

Bonny testified that Maloney never possessed a key to 1721 Grand Boulevard. And while Bonny never expressly told Maloney to leave or that he was not welcome, he also indicated that he barely spoke to Maloney the entire time Maloney was staying at the home. Bonny explained that he worked 65-hour weeks as a framer and a drywaller and was not home often. When he was home, Maloney was usually sleeping. Bonny testified that he did not want Maloney living at his home. Bonny also testified that when he left 1721 Grand Boulevard on the morning of the incident, there was no one else in the home other than Jayla and Tobias and no one else was supposed to be in the home. Bonny testified that when he left the home that morning, he locked the back door, which was the usual way of entering and exiting the home. The front door was always locked.

{¶ 49} Jayla testified that while Maloney stayed at the home, he slept on the sofa. He did not have his own bedroom. He also was not paying rent. While Maloney provided Jayla with some food stamps while he was staying there, he made her pay the full street price for the stamps. Jayla did not directly tell Maloney to leave, but she thought he "felt some type of way, I guess" and "left on his own." And, according to Jayla, when he left, he took "all of [his] things and [his] belongings," which suggests Maloney knew he was not able to return. Upon our review, the evidence suggests that Maloney likely left based on the recognition that he was no longer welcome after Jayla became annoyed with him over the food stamp issue.

{¶ 50} Jayla also testified that while Maloney was staying with them at 1721 Grand Boulevard, he was never allowed to be in the home without her also being present. He was welcome to knock on her door and ask to come in, but he did not have permission to come and go as he wanted. Jayla also confirmed that Maloney did not have a key to the residence. Only she and Bonny had keys to the home.

{¶ 51} Finally, there was evidence that Maloney changed clothing to conceal his identity upon entering the residence. Additionally, there was evidence that Maloney let himself into the home by breaking the seal that was securing the cardboard to the back door opening and by reaching in and unlocking the door. These facts suggest that Maloney subjectively knew he lacked a privilege to enter 1721 Grand Boulevard.

{¶ 52} In sum, the evidence supported the conclusion that Maloney was only a temporary guest at 1721 Grand Boulevard. He was living an itinerant lifestyle and was "couch surfing" from place to place. Jayla was adamant that Maloney had no privilege to enter the residence without her express permission and, consistent with this restriction, had provided him with no key to the property. That he was able to get into the property by accessing it through the broken window does not negate the fact that he lacked a privilege to enter the property, and in fact underscores the fact that his only means of entering the property were through illegitimate means.

{¶ 53} For these reasons, we find that sufficient evidence and the greater weight of evidence established that Maloney was a trespasser when he entered the property on the morning of December 21, 2021. Accordingly, Maloney's argument with regard to the "trespass" element of the aggravated burglary offense is without merit and we overrule Maloney's fourth and fifth assignments of error.

**B. Allied Offenses and Merger**

{¶ 54} Maloney's first assignment of error states:

{¶ 55} THE TRIAL COURT COMMITTED ERROR WHEN IT FAILED TO MERGE MR. MALONEY'S CONVICTIONS OF AGGRAVATED BURGLARY AND FELONIOUS ASSAULT AS REQUIRED BY R.C. 2941.25.

{¶ 56} Maloney contends that the court erred by failing to merge Count One,

aggravated burglary, with Counts Two and Three, felonious assault. Maloney argues that the felonious assault counts were essential elements of the aggravated burglary count and the evidence presented at trial did not support the trial court's conclusion that he separately committed the offenses. Maloney's merger argument arises within the context of the constitutional prohibition against double jeopardy and the law on allied offenses.

### 1. Double Jeopardy and the Law on Allied Offenses

{¶ 57} Both the Ohio Constitution and the United States Constitution "prohibit the government from subjecting a person to multiple punishments for the same offense." *State v. Herzner*, 12th Dist. Clermont No. CA2021-02-005, 2021-Ohio-4244, ¶ 10, citing *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, ¶ 10. The double jeopardy provision in Article I, Section 10 of the Ohio Constitution states, "No person shall be twice put in jeopardy for the same offense." The double jeopardy provision of the Fifth Amendment to the United States Constitution states that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb * * *." The federal double jeopardy clause applies to Ohio citizens through the Fourteenth Amendment to the United States Constitution. *Benton v. Maryland*, 395 U.S. 784, 794, 89 S.Ct. 2056 (1969). After citing both of these constitutional provisions, the Ohio Supreme Court in *Ruff* explained that "[t]he Double Jeopardy Clause protects against three abuses: (1) 'a second prosecution for the same offense after acquittal,' (2) 'a second prosecution for the same offense after conviction,' and (3) 'multiple punishments for the same offense.'" *Ruff* at ¶ 10, quoting *North Carolina v. Pearce*, 395 U.S. 711, 717, 89 S.Ct. 2072 (1969).

{¶ 58} The state and federal constitutional protection against the third abuse— multiple punishments for the same criminal offense—is codified in R.C. 2941.25, Ohio's allied-offenses statute. *State v. Conrad*, 12th Dist. Butler No. CA2018-01-016, 2018-Ohio-

5291, ¶ 43. The allied offense statute provides:

> (A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

> (B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

R.C. 2941.25. Stated more simply, R.C. 2941.25 provides that in determining whether offenses are "allied" and therefore must be merged for sentencing, courts are instructed to consider three separate factors: the conduct, the animus, and the import. *State v. Singh*, 12th Dist. Warren No. CA2020-09-056, 2021-Ohio-2158, ¶ 60, citing *Ruff* at syllabus. "[A] defendant may be convicted of multiple offenses arising out of an episode of criminal conduct if: 1) the offenses did not have the same import, i.e. the offenses created separate, identifiable harms; 2) the offenses were committed separately; *or* 3) there was a separate animus or motivation in committing the offenses." (Emphasis added.) *State v. Clowers*, 12th Dist. Clermont No. CA2019-01-009, ¶ 30, citing *Ruff* at ¶ 25. The critical inquiry for an analysis under R.C. 2941.25 is the conduct of the defendant. *Id.*, citing *Ruff* at ¶ 26. An appellate court reviews de novo the trial court's R.C. 2941.25 merger determination. *Id.* at ¶ 32. We now turn to our de novo analysis.

## 2. Analysis

{¶ 59} The trial court declined to merge Maloney's aggravated burglary and felonious assault convictions. The trial court provided the following rationale for its decision:

> My ruling on that issue is going to be as follows. First of all, I will note that, in the Court's opinion, and I'm going to put this in layman's speech as much as I can, you can (indiscernible) commit one offense without doing the other. In other words, the

aggravated burglary, which obviously contains a different mens rea. You have to have purpose in that one. You can commit the aggravated burglary; in other words, have the purpose to commit the offense without actually going through with the offense. Once you get inside the residence and you have that purpose, you knowingly make a separate decision to go ahead with that and commit the felonious assaults that we have here. So primarily on that basis, I am going to find that these are not allied offenses, and we will proceed to sentencing, or I will proceed to pronounce sentencing on all three counts.

{¶ 60} The trial court's analysis focused on the question of whether "you can * * * commit one offense without doing the other." The court reviewed the elements of the two offenses, focusing on the fact that the offense of aggravated burglary requires the mens rea of "purposely," whereas the offense of felonious assault requires the mens rea of "knowingly."[5] The court then concluded that, "You can commit the aggravated burglary; in other words, have the purpose to commit the offense without actually going through with the offense." Stated otherwise, the court concluded that, based on the elements of the offenses, it is theoretically possible to commit aggravated burglary and, immediately after, to commit felonious assault.

{¶ 61} However, the trial court's comparison of the elements of the offenses was not the proper approach to allied offenses analysis. The Ohio Supreme Court has explained that,

Rather than compare the elements of two offenses to determine

---

5. R.C. 2911.11(A)(1) defines aggravated burglary as follows:

No person, by force, stealth, or deception, shall trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, when another person other than an accomplice of the offender is present, with purpose to commit in the structure or in the separately secured or separately occupied portion of the structure any criminal offense, if any of the following apply: * * * The offender inflicts, or attempts or threatens to inflict physical harm on another * * *.

R.C. 2903.11(A)(1), the felonious assault statute, defines the offense as: "No person shall knowingly * * * Cause serious physical harm to another * * *."

whether they are allied offenses of similar import, the analysis must focus on the defendant's conduct to determine whether one or more convictions may result, because an offense may be committed in a variety of ways and the offenses committed may have different import. No bright-line rule can govern every situation.

*Ruff*, 2015-Ohio-995 at ¶ 30. Instead of analyzing the elements of offenses to decide if they are allied offenses, the supreme court explained that a trial court must ask,

(1) Were the offenses dissimilar in import or significance? (2) Were they committed separately? and (3) Were they committed with separate animus or motivation? An affirmative answer to any of the above will permit separate convictions.

*Id.* at ¶ 31.[6]

{¶ 62} On appeal, Maloney argues that the answer to all three questions is "no," so the trial court should have merged the offenses. We will now examine each question in turn, basing our analysis on Maloney's conduct in this case, as required by *Ruff*.

**a. Were the offenses dissimilar in import or significance?**

{¶ 63} Maloney argues that "the aggravated burglary and felonious assault[s] were offenses of similar import." The state made no argument in its brief that the offenses were of dissimilar import, and in fact the state explicitly conceded at oral argument that the offenses did *not* have dissimilar import. Because the parties agree that the answer to the first *Ruff* question—"Were the offenses dissimilar in import or significance?"—was "no," our analysis could end there.

{¶ 64} But even if the parties did not agree, we have reviewed the record, and we

---

6. As part of its analysis, the trial court also stated, "Once you get inside the residence and you have that [aggravated burglary] purpose, you knowingly make a separate decision to go ahead with that and commit the felonious assaults that we have here." It is possible the court used "you" to refer specifically to Maloney, who was in the courtroom. Therefore, it is possible that in addition to analyzing the elements of the aggravated burglary and felonious assault offenses, the court also analyzed Maloney's behavior, as *Ruff* requires. However, even if this is the case, it does not impact or alter our de novo analysis with regard to Maloney's first assignment of error.

conclude that the import of the relevant offenses was not dissimilar in this case. On remand from *Ruff*, the First District Court of Appeals, faced with the question of whether aggravated burglary and rape were allied offenses, held that,

> where the conduct that constitutes one offense causes a harm that is not separate and identifiable from the harm caused by the aggravating element of another offense, then the offenses are of a similar import.

*State v. Ruff*, 1st Dist. Hamilton Nos. C-120533 and C-120534, 2015-Ohio-3367, ¶ 18 (DeWine, J.). The First District further explained that,

> The element of physical harm for each aggravated burglary was established by Ruff's rape of the victim. The harm that resulted from the rape of each victim was [the] same harm that resulted when each burglary escalated to aggravated burglary. Thus, the harms were not "separate and identifiable."

*Id.* at ¶ 19.

{¶ 65} We agree with this analysis. Maloney committed the aggravating element of aggravated burglary—"The offender inflicts, or attempts or threatens to inflict physical harm on another * * *," R.C. 2911.11(A)(1)—when he committed the felonious assaults on Jayla and Tobias by throwing hot oil on them. We conclude that Maloney's aggravated burglary and felonious assault offenses were committed with the same import because the harm caused by the aggravated burglary and the felonious assault were the same. As stated above, Maloney and the state agree with our conclusion that the offenses were not committed with dissimilar import.

**b. Were the offenses committed separately?**

{¶ 66} Maloney argues that the aggravated burglary and felonious assault offenses were not separately committed. Maloney argues this is the case because "[t]he conduct constituting the 'physical harm' of the felonious assault was 'an element of' the aggravated burglary conviction." He also states that "The act of aggravated burglary was not complete

until [Jayla], and her son were physically harmed. But for the conduct constituting the physical harm, Mr. Maloney would not have committed both offenses."

{¶ 67} The state disagrees, arguing the offenses were committed separately, one after the other. Specifically, the state argues that Maloney completed the offense of aggravated burglary *before* throwing the pot of oil on Jayla and Tobias. The state's argument relies on the fact that the aggravating element of aggravated burglary in this case—that is, "the offender inflicts, or attempts or threatens to inflict physical harm on another * * *," R.C. 2911.11(A)(1)—includes "attempts" to inflict physical harm on another. The state contends that once Maloney left the kitchen with the pot of hot oil and started going up the stairs, the only reason he did so was to assault Jayla and Tobias. Therefore, the state argues, at that point in time Maloney was engaged in an "attempt" to inflict physical harm. As such, the state argues that Maloney's "attempt," which completed his aggravated burglary, was completed before he ultimately threw the hot oil on Jayla and Tobias, and therefore the aggravated burglary and the felonious assaults were committed separately in time.

{¶ 68} We have previously held that if an offender completes one offense before the other begins, then "'the offenses are considered separately for sentencing purposes even though the two offenses may have been committed in close proximity in time.'" *Clowers*, 2019-Ohio-4629 at ¶ 30, quoting *State v. Fields*, 12th Dist. Clermont No. CA2014-03-025, 2015-Ohio-1345, ¶ 18. But that is not what happened here. Here, the evidence established that Maloney trespassed in 1721 Grand Boulevard with the purpose of committing felonious assault (there is no other reasonable expectation for why he entered 1721 Grand Boulevard with vegetable oil, heated that oil, and then took that hot oil upstairs to a bedroom) and then *in fact* perpetrated felonious assaults upon Jayla and Tobias. The evidence established a

singular act of trespassing into the home, preparing the oil to commit the assault, and the actual commission of the assault. There was no evidence of an "attempt" to commit felonious assault, followed in time by the commission of felonious assault.

{¶ 69} What the state is essentially asking us to do is to ignore what occurred after Maloney heated the oil and began moving towards the bedroom. But this is not the analysis called for by *Ruff*, which requires us to focus on Maloney's actual conduct in the case. 2015-Ohio-995 at ¶ 30-31. Nor does the merger analysis permit us to hypothesize—as the state requests we do—about whether Maloney could have been convicted of an attempt crime if he, as in the example offered by the state, was caught red-handed by police on the way up the stairs with the pot of hot oil. Instead, we conduct the merger analysis based on the evidence at trial. And in this case, there was no evidence at trial of a mere attempted felonious assault. The evidence proved that felonious assault was completed, not merely attempted.

{¶ 70} An "attempt" occurs when an offender "engage[s] in conduct that, *if successful*, would constitute or result in the offense." (Emphasis added.) R.C. 2923.02(A). In other words, an "attempt" is not "successful" and complete. But here, Maloney's plan to assault *was* "successful" and complete. Maloney entered the home with the purpose of committing a violent crime and completed that crime when he threw hot oil on Jayla and Tobias. The evidence did not show that Maloney attempted to commit felonious assault, and later made a second attempt that was successful. As a result, we conclude that the aggravated burglary and the felonious assault were *not* committed separately.

{¶ 71} Finally, the trial court relied on *State v. Hazley*, 2d Dist. Montgomery No. 27107, 2016-Ohio-7689, in reaching its conclusion that the offenses should not merge, so we will briefly address that case. In *Hazley* the Second District Court of Appeals found that

aggravated burglary and felonious assault offenses should not merge, based on the facts of that case. *Id*. at ¶ 21. There, Hazley trespassed by refusing to leave the victim's apartment when requested, with the purpose of stealing money. *Id*. at ¶ 3. When the victim continued to ask Hazley to leave, Hazley initially hit the victim on the arms and head while demanding money. Only after the victim continued to refuse to give Hazley money did she grab the victim's "left forearm and twist[] it approximately three to four times, resulting in a six to seven inch tear in the skin on [the victim's] arm." *Id*. The Second District reasoned that,

> once Hazley was found to be trespassing in [the victim's] residence, her purpose was to commit a theft by inflicting physical harm upon [the victim] by striking him about his head and upper body. Essentially, the aggravated burglary was completed by an attempt to forcibly obtain money before Hazley committed the felonious assault offense against [the victim] by grabbing his left forearm and tearing his skin apart.

*Id.* at ¶ 21. The court of appeals found that the action that constituted the felonious assault was not an element of the aggravated burglary, so the offenses did not merge.

{¶ 72} *Hazley* is distinguishable from the case before us. Hazley trespassed with the intent of committing theft by the use of physical attack. However, Hazley's felonious assault was not part of the initial aggravated burglary, and only took place when Hazley's initial physical attack on the victim was unsuccessful. In our case, on the other hand, felonious assault was the very reason for Maloney's aggravated burglary. For these reasons, we conclude that Maloney did not separately commit the aggravated burglary and the felonious assaults.

### c. Were the offenses committed with separate animus or motivation?

{¶ 73} Maloney argues that there is no evidence that the aggravated burglary and the felonious assaults were committed with separate animus. The state made no argument

- 23 -

in its brief that the offenses were committed with separate animus, and in fact the state explicitly conceded at oral argument that the offenses were *not* committed with separate animus. Because the parties agree that the answer to the third *Ruff* question—were the offenses "committed with separate animus or motivation?"—was "no," our analysis could end there.

{¶ 74} But even if the parties had not agreed, we have reviewed the record and find that the relevant offenses were committed with the same animus. "Animus" is defined for purposes of R.C. 2941.25(B) as "purpose" or "more properly, immediate motive." *State v. Lung*, 12th Dist. Brown No. CA2012-03-004, 2012-Ohio-5352, ¶ 12. "'If the defendant acted with the same purpose, intent, or motive in both instances, the animus is identical for both offenses.'" *Id.*, quoting *State v. Lewis*, 12th Dist. Clinton No. CA2008-10-045, 2012-Ohio-885, ¶ 13. There was no evidence submitted of a separate animus. Instead, the facts indicate Maloney acted with a single criminal motive: to enter the victims' home for the purpose of inflicting physical harm on the victims.

### d. Conclusion Regarding Allied Offenses Analysis

{¶ 75} Based on the foregoing analysis, we do not find that the aggravated burglary and felonious assault offenses were of dissimilar import, were committed separately, or that there was a separate animus or motivation between the offenses. Thus, we conclude that the trial court erred when it declined to merge the offense of aggravated burglary with the two felonious assault counts for purposes of sentencing. *See* R.C. 2941.25.

{¶ 76} We sustain Maloney's first assignment of error, vacate Maloney's sentence, and remand solely for resentencing. On remand, the state may elect the offense or offenses it intends to pursue for sentencing purposes. *State v. Powih*, 12th Dist. Brown No. CA2016-11-023, 2017-Ohio-7208, ¶ 43; *State v. Whitfield*, 124 Ohio St.3d 319, 2010-Ohio-2, ¶ 20,

24. The trial court may also clarify the discrepancy between what it stated verbally at sentencing and what it stated in its sentencing entry with regard to whether any possible sentences are to be run consecutively or concurrently.

## C. Other Sentencing Issues

{¶ 77} Maloney's second assignment of error states:

{¶ 78} THE TRIAL COURT'S SENTENCE WAS CONTRARY TO LAW WHEN IT SENTENCED MR. MALONEY TO A MAXIMUM TERM OF 10 YEARS ON A REPEAT VIOLENT OFFENDER SPECIFICATION.

{¶ 79} Maloney's third assignment of error states:

{¶ 80} THE TRIAL COURT ERRED WHEN IT SENTENCED MR. MALONEY TO CONSECUTIVE TERMS TOTALING 37-42 YEARS IN THE OHIO DEPARTMENT OF REHABILITATION AND CORRECTIONS RESULTING IN AN EXCESSIVE AND DISPROPORTIONAL TERM OF INCARCERATION.

{¶ 81} In his second and third assignments of error, Maloney challenges his sentence. Our resolution of Maloney's first assignment of error renders Maloney's second and third assignments of error moot, as the trial court will resentence Maloney. Accordingly, we decline to address these assignments of error. App.R. 12(A)(1)(c).

## III. Conclusion

{¶ 82} Sufficient evidence and the manifest weight of the evidence supported Maloney's conviction for aggravated burglary. However, the law required merger of Maloney's conviction for aggravated burglary with his convictions for felonious assault. We affirm the jury verdicts but vacate Maloney's sentence and remand solely for resentencing.

{¶ 83} Judgment affirmed in part and reversed in part. Sentence vacated, and remanded for resentencing.

S. POWELL, P.J., and PIPER, J., concur.